[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 01-15148

_____

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 21, 2003
THOMAS K. KAHN
CLERK

D. C. Docket No. 00-00079-CR-1-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID HENSON MCNAB,
ROBERT D. BLANDFORD, et al.,

Defendants-Appellants.

_____

No. 02-10810

_____

D. C. Docket No. 00-00079-CR-CB

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ABNER SCHOENWETTER,
ROBERT D. BLANDFORD,

Defendants-Appellants.

_____

No. 02-11264

_____

D. C. Docket No. 00-00079-CR-1-RV

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID HENSON MCNAB,
ABNER SCHOENWETTER, et al.,

Defendants-Appellants.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

**(March 21, 2003)**

Before HULL, WILSON and FAY, Circuit Judges.

WILSON, Circuit Judge:

David Henson McNab, Abner Schoenwetter, Robert D. Blandford, and

Diane H. Huang (collectively the defendants) appeal the convictions and sentences

they received after a jury found them guilty of conspiracy, smuggling, money

laundering, and Lacey Act violations in connection with the importation, sale, and

2

purchase of Caribbean spiny lobsters from Honduras. The defendants' main argument on appeal is that the district court erred in determining that the Honduran laws that served as the underlying basis of their convictions were valid and enforceable. The defendants contend that the Honduran laws were invalid, and, therefore, there was no violation of foreign law upon which to base their convictions.[1]

The defendants' challenge to the validity of the Honduran laws requires us to undertake our own foreign law determination. Our task is complicated by conflicting representations from Honduran officials regarding the validity of the Honduran laws. Throughout the investigation and trial, Honduran officials offered support and assistance to the United States government, and both the government and the district court relied upon the Honduran officials' verification of the Honduran laws. Shortly after the defendants were convicted, the Honduran government reversed its position; it currently refutes the validity of the laws it previously verified. Therefore, we must decide whether our courts are bound by a foreign government's new representations regarding the validity of its laws when

---

[1]The Lacey Act prohibits the importation of "fish or wildlife taken, possessed, transported, or sold in violation of . . . any foreign law." 16 U.S.C. § 3372(a)(2)(A). If the lobsters were not imported, transported, and sold in violation of Honduran law, there could be no Lacey Act violations. Accordingly, if the lobsters were brought into the United States legally and were not criminally-derived property, there could be no smuggling or money laundering violations.

its new representations are issued only postconviction and directly contravene its original position upon which the government and our courts relied and the jury acted. This question is a matter of first impression in this Circuit and apparently the other circuits as well.

For the reasons set forth below, we affirm the defendants' convictions and sentences.

BACKGROUND

On February 3, 1999, agents of the National Marine Fisheries Service (NMFS) received an anonymous facsimile, which provided that McNab's cargo transport vessel, the M/V Caribbean Clipper, would arrive in Bayou la Batre, Alabama on February 5, 1999, with a shipment of lobsters containing "undersized (3&4 oz) lobster tails, [which was] a violation of Honduran law." The facsimile further provided that Honduras prohibits the bulk exportation of lobsters and requires that lobsters be packed in boxes for export.

In response to the anonymous tip, NMFS agents consulted the Direccion General de Pesca y Acuicultura (DIGEPESCA) in Honduras[2] regarding the legality of the lobster shipment referenced in the facsimile. The NMFS agents

---

[2]The DIGEPESCA is the agency within Honduras's Secretaria de Agricultura y Ganaderia (SAG) that is responsible for the enforcement of the fishing laws and the execution of fishing programs.

questioned whether the shipment violated the Lacey Act, which makes it unlawful to import into the United States "fish or wildlife [that has been] taken, possessed, transported, or sold in violation of . . . any foreign law." 16 U.S.C. § 3372(a)(2)(A). In three separate letters responding to the agents' inquiry, the director general of the DIGEPESCA described some of Honduras's fishing laws and confirmed that McNab's shipment "ha[d] been illegally transported in violation of the Fishing Law, the Industrial and Hygienic Sanitary Inspection Regulation for Fish Products and Resolution No. 030-95." The director general provided authentic copies of the applicable laws and stated that the DIGEPESCA was ready to support all efforts by the government to prosecute persons who violate the Lacey Act.

In early March of 1999 NMFS agents seized the lobster shipment that was referenced in the anonymous facsimile based upon the director general's assurances that the lobsters had been exported in violation of Honduran law. Over the next few months, NMFS agents communicated with Honduran officials about the Honduran laws and the legality of the seized lobster shipment. In June of 1999 NMFS special agents and an attorney in the United States National Oceanic and Atmospheric Administration Office of the General Counsel met with various Honduran officials from the Secretaria de Agricultura y Ganaderia (SAG) in

5

Tegucigalpa, Honduras.  The minister, the vice minister, the director of legal services, the director of legal affairs, the secretary general of the SAG, the director general of the DIGEPESCA, and the legal advisor for the Servicio Nacional de Sanidad Agropecuaria (SENASA)[3] confirmed that the lobsters had been exported illegally without first being inspected and processed.  Furthermore, the Honduran officials confirmed that there was a 5.5-inch size limit for lobster tails and that all catches had to be reported to Honduran authorities.  The Honduran officials provided certified copies of the laws in question.  In September of 1999 NMFS agents inspected the lobster shipment that had been seized earlier in the year.  The inspection confirmed that the seized lobsters were packed in bulk plastic bags without being processed and revealed that a significant number had a tail length that was less than the 5.5 inches required by the Honduran size limit restriction.  In addition, many of the lobsters were egg-bearing or had their eggs removed.

In March of 2000 two Honduran officials, a legal advisor in the Despacho Ministerial and a SAG legal advisor, traveled to Alabama to meet with government prosecutors and investigators.  Both legal advisors provided written statements that cited Resolution 030-95 as a valid law regulating the lobster

---

[3]Like the DIGEPESCA, the SENASA is an agency within the SAG.  The SENASA is responsible for the enforcement of hygiene laws and regulations.

fishing industry. They also described the processing requirements mandated by Regulation 0008-93.[4] They further explained that Honduras prohibits the harvesting of egg-bearing lobsters.[5] Based upon the NMFS's investigation and the verification of the applicable foreign laws by the Honduran officials charged with regulating the lobster fishing industry, the government decided to prosecute the defendants for their roles in the illegal importing scheme. Subsequently, the grand jury returned a forty-seven-count second superseding indictment in September of 2000.[6]

To determine the validity of the relevant Honduran laws, the district court conducted a pretrial hearing on foreign law in September of 2000. Most of the defendants' evidence at the hearing pertained to the validity of Resolution 030-95, which established a 5.5-inch size limit for lobsters.[7] At the government's request,

---

[4]Processing lobster tails involves several steps: thawing, sorting, and grading the lobsters by quality and size; placing the tails in individual plastic sleeves; and packing them in boxes.

[5]The legal advisors cited Resolution 003-80 as authority for the prohibition against harvesting or destroying egg-bearing lobsters. Resolution 003-80 is substantially similar to Article 70(3) of the Fishing Law, as both laws prohibit the harvesting or destruction of lobster eggs. At the foreign law hearing, the government acknowledged that it could not verify the publication of Resolution 003-80 in La Gaceta and therefore relied upon Article 70(3) as a Lacey Act predicate.

[6]Although the investigation focused initially upon the seized shipment referenced in the facsimile, the indictment charged the defendants with violations based upon numerous shipments of lobsters between 1996 and 1999.

[7]Two law professors, both experts in Honduran law, testified for the defendants. The defendants also submitted a number of legal opinions from members of the Honduran legal

the minister of the SAG sent Secretary General Liliana Patricia Paz, the SAG's

highest-ranking legal official, to testify at the foreign law hearing. Secretary

General Paz testified as to the validity of various laws and confirmed that

Resolution 030-95, Regulation 0008-93, and Article 70(3) of the Fishing Law[8]

were in effect and legally binding during the time period covered by the

indictment. She also explained the means by which a Honduran citizen may seek

the invalidation of a resolution in Honduras,[9] and she testified that no such

proceeding regarding Resolution 030-95 had been initiated at that time. Persuaded

by the testimony of Secretary General Paz, the district court found that the

government met its burden of establishing the validity of the Honduran laws that

served as the predicates for the Lacey Act charges. Shortly after the foreign law

hearing, a jury trial was conducted, and the defendants were found guilty on

---

community, including the attorney general of Honduras and the regional prosecutor of the Fiscalia Especial Para la Defensa de la Constitución, and a declaration from a practicing Honduran attorney.

[8]The Fishing Law is a comprehensive statute regulating the Honduran fishing industry. *See* Decreto No. 154, May 19, 1959, La Gaceta, June 9, 1959.

[9]The Honduran judicial system includes a separate administrative law court system in which disputes relating to administrative matters are adjudicated. Among the procedures available in the administrative court system is an action by a Honduran citizen who claims to be affected adversely by some administrative rule to seek a declaration that the rule is invalid. Such an action is first brought in the Honduran Court of the First Instance of Administrative Law. Decisions from that court may be appealed to the Honduran Court of Appeals for Administrative Law.

multiple counts.[10]

After the trial, the defendants filed a number of motions seeking to have their convictions overturned.[11]  In the motions, they attacked the validity of the foreign laws underlying their convictions, citing recent developments in Honduran law.  In preparation for a hearing on the motions, an official from the United States Department of Justice and agents from the NMFS and the Federal Bureau of Investigation traveled to Honduras in early August of 2001 to discuss the defendants' challenges to the validity of the Honduran laws.  They received affidavits from three Honduran government officials, including Secretary General Paz, confirming the validity of the laws the defendants were challenging.  They also received an affidavit from the minister of the SAG, stating that those Honduran government officials were authorized to provide advice on the enforcement and validity of the laws.  After the hearing, the district court dismissed each of the defendants' posttrial motions.  Thereafter, in August of 2001, the district court sentenced McNab, Blandford, and Schoenwetter to ninety-

---

[10]McNab was found guilty of conspiracy, smuggling, and money laundering.  Blandford was found guilty of conspiracy, smuggling, Lacey Act violations, and money laundering, as well as two lesser included offenses under the Lacey Act.  Schoenwetter was found guilty as charged for conspiracy and smuggling, and Huang was found guilty as charged for conspiracy, Lacey Act violations, and false labeling.

[11]The final set of motions included a motion to dismiss because the indictment failed to charge a crime, a motion for a new trial based upon newly discovered evidence, and a motion for redetermination of foreign law based upon developments in Honduran law.

seven months of imprisonment and Huang to twenty-four months of imprisonment.

After sentencing, the defendants appealed their convictions based, in part, upon their contention that the Honduran laws used as the predicates for the Lacey Act convictions were invalid or void during the time period covered by the indictment.[12] In December of 2001 a government attorney and NMFS agents traveled to Honduras to discuss the defendants' new documents with Honduran officials to prepare the government's brief on appeal. Once again, the Honduran officials confirmed their prior statements regarding the validity of the Honduran laws.

The defendants raise a number of issues in these consolidated appeals. First, they argue that the scope of the Lacey Act is limited to foreign statutes and

---

[12]After the initial notice of appeal, the defendants obtained additional support for their claim that the district court misinterpreted Honduran law. As a result, they filed a Motion for Judicial Notice, as well as alternative motions regarding newly issued Honduran legal opinions with this Court. We denied those motions without prejudice and held that the motions could be renewed if the district court refused to certify its intention to grant a new trial pursuant to *United States v. Ellsworth*, 814 F.2d 613 (11th Cir. 1987) (per curiam).

Based upon our order, in January of 2002 McNab filed a Motion for Order Certifying Intention to Grant New Trial Upon Remand with the district court, which was subsequently adopted by Blandford, Schoenwetter, and Huang. After initially denying the motion, the district court granted the defendants' motion for reconsideration. Upon reconsideration, the district court affirmed its earlier order that it would not certify its intention to grant a new trial. The defendants appeal that order and argue that the district court erred in denying the motion to certify its intention to grant a new trial upon remand. In light of our holding regarding the validity of the Honduran laws, we need not address this issue.

that the Honduran resolutions and regulations listed in the indictment were used improperly as predicates for their convictions. Second, they contend that the district court's interpretation of the Honduran resolutions and regulations was erroneous and that the Honduran laws that served as predicates for the convictions were invalid. Third, McNab argues that the district court abused its discretion by excluding evidence at trial relating to his "knowledge" of Honduran law. Fourth, the defendants assert that the district court made several errors with respect to the jury instructions. Fifth, they contend that the jury's verdicts were based upon insufficient evidence. Finally, Schoenwetter and Blandford argue that the district court erred in failing to postpone their sentencing and in determining the length of their sentences.

DISCUSSION

I. Scope of the Lacey Act

The first issue we address is whether the phrase "any foreign law" in the Lacey Act includes foreign regulations and other legally binding provisions that have the force and effect of law. The defendants argue that the phrase "any foreign law" should be read to mean foreign statutes and not foreign regulations or provisions that are legally binding. According to their argument, Resolution 030-95 and Regulation 0008-93 do not fall within the scope of the Lacey Act, because

11

they are not statutes.[13]  They rely upon what they consider a distinction by Congress between "any law or regulation of any State" and "any foreign law."  16 U.S.C. § 3372(a)(2)(A).  The defendants argue that by failing to include foreign regulations explicitly, Congress intended that only foreign statutes could serve as the basis for a foreign law Lacey Act violation.

In accordance with the plain meaning doctrine, "[w]e begin our construction of . . . [the Lacey Act] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision."  *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc), *cert. denied*, 532 U.S. 1065 (2001); *United States v. Gilbert*, 198 F.3d

---

[13]The parties do not dispute the following explanation of the Honduran legal framework:

> The Government of Honduras is a constitutional republic.  Its legal system is generally under the continental or civil law system . . . . [T]he Constitution is the supreme law of the Republic.
>
> The adoption of statutes in Honduras (issued as "Decrees") is the exclusive prerogative of the National Congress.  At the same time, the Constitution . . . vests in the Executive Branch the exclusive authority to issue "Regulations[."]  Regulations (issued in the form of "Acuerdos" – in English, "Accords" or "Decisions" or "Agreements") are general rules of conduct applicable to all who may be affected by them and they have the force of law.  The Constitution provides that Regulations may be issued only by the President of the Republic with the co-signature of the Secretary of State. [sic] (*i.e.* Chief Minister) of the pertinent ministry.  Both statutes and regulations become effective only when they are published in *La Gaceta*, which is the Honduran equivalent of the *Federal Register*.

Br. of Amicus Curiae of the Embassy of Honduras and the Asociacion de Pescadores del Caribe in Supp. of Def.-Appellant David Henson McNab at 8–9 (citations omitted).

1293, 1298 (11th Cir. 1999). It is well established that "[w]hen the words of a statute are unambiguous . . . [the] judicial inquiry is complete." *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) (first alteration in original) (internal quotation marks omitted); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). When, however, "the language is ambiguous or leads to absurd results, . . . [we] may consult the legislative history and discern the true intent of Congress." *United States v. Kattan-Kassin*, 696 F.2d 893, 895 (11th Cir. 1983).[14]

With this guidance in mind, we examine the language of the Lacey Act. The Lacey Act provides that "[i]t is unlawful for any person . . . to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce . . . any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or in violation of any foreign law." 16 U.S.C. § 3372(a)(2)(A). The Act defines "law" as those "*laws* . . . which regulate the taking, possession, importation, exportation, transportation, or sale of fish or wildlife or plants." 16 U.S.C. § 3371(d) (emphasis added).

---

[14]We note that although a court may resort to extrinsic materials if the statutory language is ambiguous or if the interpretation causes absurd results, only the latter is a true exception to the plain meaning rule. *CBS Inc.*, 245 F.3d at 1227 ("Stating that ambiguity establishes an exception, instead of disestablishes the predicate for the rule, confuses things.").

Unfortunately, the statutory definition defines the word "law" by using the word "laws."[15] While the definition is helpful in determining what the "law" must regulate, it is silent as to whether "law" is restricted to statutes or includes regulations and other provisions that foreign governments use to promulgate legally binding rules. Thus, we turn first to the common usage or ordinary meaning of the word "law" to determine its plain meaning. *Cf. Consol. Bank, N.A. v. United States Dep't of the Treasury*, 118 F.3d 1461, 1464 (11th Cir. 1997) ("In the absence of a statutory definition of a term, we look to the common usage of words for their meaning."). "[T]o determine the common usage or ordinary meaning of a term, courts often turn to dictionary definitions for guidance." *See CBS Inc.*, 245 F.3d at 1223.

*Merriam Webster's Collegiate Dictionary* provides several definitions of law, including "a binding custom or practice of a community: a rule of conduct or action prescribed or formally recognized as binding or enforced by a controlling authority" and "the whole body of such customs, practices, or rules." *Merriam*

_____

[15]Section 3371(d) provides in full, "The terms 'law,' 'treaty,' 'regulation,' and 'Indian tribal law' mean laws, treaties, regulations or Indian tribal laws which regulate the taking, possession, importation, exportation, transportation, or sale of fish or wildlife or plants." 16 U.S.C. § 3371(d).

We read the word "law" to refer to laws "which regulate the taking, possession, importation, exportation, transportation, or sale of fish or wildlife or plants," and the word "treaty" to refer to treaties "which regulate the taking, possession, importation, exportation, transportation, or sale of fish or wildlife or plants," and so forth.

14

*Webster's Collegiate Dictionary* 659 (Frederick C. Mish et al. eds., 10th ed. 1996). Under these broad definitions of the word "law," the phrase "any foreign law" incorporates the Honduran decrees and regulations at issue. *See United States v. 594,464 Pounds of Salmon*, 871 F.2d 824, 826 (9th Cir. 1989).

On the other hand, there are more narrow definitions of the word "law" that also are commonly used. *Black's Law Dictionary* provides several definitions of the word "law," including one that defines law simply as "[a] statute." *Black's Law Dictionary* 889 (Bryan A. Garner et al. eds., 7th ed. 1999). This definition is plausible when the phrase "any foreign law" is read in conjunction with the rest of § 3372(a)(2)(A). For example, the defendants assert that "any foreign law" can refer only to foreign statutes, because to read "any foreign law" to include regulations would render the word "regulation" in the earlier phrase "any law or regulation of any State" meaningless.[16]

While the defendants advocate this interpretation of the statute, it is not the only reasonable one. Another is that Congress intended to punish violations of state laws and state regulations and to punish violations of foreign laws, whatever form those foreign laws may take. The Ninth Circuit, in explaining why it

---

[16]"A basic premise of statutory construction is that a statute is to be interpreted so that no words shall be discarded as being meaningless, redundant, or mere surplusage." *United States v. Canals-Jimenez*, 943 F.2d 1284, 1287 (11th Cir. 1991).

interpreted "any foreign law" to cover different forms of foreign laws, emphasized how the world's diverse legal systems defy easy definition or categorization. It noted,

> [B]ecause of the wide range the forms of law may take given the world's many diverse legal and governmental systems, Congress would be hard-pressed to set forth a definition that would adequately encompass all of them. . . . Thus, if Congress had sought to define "any foreign law" with any kind of specificity whatsoever, it might have effectively immunized . . . [conduct] under the Act despite violation of conservation laws of a large portion of the world's regimes that possess systems of law and government that defy easy definition or categorization.

*594,464 Pounds of Salmon*, 871 F.2d at 827–28. In other words, the argument is that Congress specifically chose to limit domestic law to statutes and regulations, but specifically chose to use the language "any foreign law" to cover the wide varieties of laws in foreign countries.

The net result is that there are several reasonable ways to interpret the word "law" in the phrase "any foreign law." As a result of this ambiguity, we look beyond the language of the statute to determine legislative intent. We thus now look to the legislative history of the Lacey Act to ascertain Congress's intent. *Fed. Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1239 (11th Cir. 2000). "In trying to learn Congressional intent by examining the legislative history of a statute, we look to the purpose the original enactment served, the discussion of

16

statutory meaning in committee reports, the effect of amendments whether accepted or rejected and the remarks in debate preceding passage." *Rogers v. Frito-Lay, Inc.*, 611 F.2d 1074, 1080 (5th Cir. 1980).[17]

The Lacey Act was introduced by Representative John F. Lacey of Iowa in 1900. H.R. Rep. No. 97-276, at 7 (1981) (discussing the enactment of the Lacey Act). Representative Lacey recognized that individual states were unable to protect their wildlife, because their laws did not reach into neighboring states. *Id*. Thus, he asserted that a federal law was necessary to outlaw the interstate traffic in wildlife illegally taken from their state of origin.[18] *Id*. By 1981 Congress recognized the need to strengthen the Lacey Act in response to "the massive illegal trade in fish, wildlife and plants." 127 Cong. Rec. 17,327 (1981) (remarks of Senator Lincoln Chafee). Congress thus amended the Lacey Act in 1981 "to correct . . . insufficiencies" in the Act and "to simplify administration and enforcement."[19] S. Rep. No. 97-123, at 2 (1981), *reprinted in* 1981 U.S.C.C.A.N.

---

[17]In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[18]In 1935 the Lacey Act was amended to include foreign law because of concern over the illegal marketing of wildlife from other countries. H.R. Rep. No. 97-276, at 7.

[19]The Lacey Act Amendments of 1981 combined the Lacey Act of 1900 and the Black Bass Act of 1926. 127 Cong. Rec. 26,537 (1981) (remarks of Representative John Breaux). The Black Bass Act was similar to the Lacey Act in that it prohibited the interstate transportation of fish taken in violation of state or foreign law. *See* 127 Cong. Rec. 17,329 (remarks of Senator

17

1748, 1749.

Although there are certain parts of the legislative history of the Lacey Act that support the defendants' position to some extent, the legislative history reflects that "the [main] thrust of Congress's intention in amending the Act was to expand its scope and enhance its deterrence effect."[20]  *594,464 Pounds of Salmon*, 871 F.2d at 828.  Indeed, Congress clearly stated that the amendments were meant to strengthen the existing wildlife protection laws and to "provide [the government] the tools needed to effectively control the massive illegal trade in fish, wildlife and plants."  127 Cong. Rec. 17,327 (remarks of Senator Chafee); *see also* 127 Cong. Rec. 26,537 (1981) (remarks of Representative John Breaux).  The Senate Report provided that the amendments "would allow the Federal Government to provide more adequate support for the full range of State, foreign and Federal laws that protect wildlife."  S. Rep. No. 97-123, at 4.  The amendments were intended to "raise both the civil and criminal penalties of the current laws and target commercial violators and international traffickers."  127 Cong. Rec. 17,328

---

Howard Baker).

[20]The defendants point to the fact that the pre-1981 Lacey Act prohibited trade in wildlife taken in violation of "any law or regulation of any State or foreign country," but that now the Lacey Act does not refer to foreign laws and regulations.  "While the legislative history is not totally one-sided, the thrust of Congress's intention in amending the Act was to expand its scope and enhance its deterrence effect."  *594,464 Pounds of Salmon*, 871 F.2d at 828.

(remarks of Senator Chafee). By strengthening the penalty provisions of the Lacey Act, Congress intended "to give the Federal Government stronger enforcement tools to stop the large-scale importation and taking of fish . . . which enjoy protection under other foreign . . . laws." *Id*. at 17,329 (remarks of Senator James Strom Thurmond).

Our examination of the legislative history of the Lacey Act leads us to the conclusion that Congress by no means intended to limit the application of the Act by its adoption of the 1981 amendments. The defendants' interpretation is untenable, because it would restrict the application of the Lacey Act unduly and would thwart Congress's stated goal of strengthening the Act by amending it in 1981. *See id*. at 17,328 (remarks of Senator Chafee). Their narrow interpretation of the phrase "any foreign law" would prevent the wildlife conservation laws of many countries from serving as the basis for Lacey Act violations and would limit the Act's utility. We therefore conclude that regulations and other such legally binding provisions that foreign governments may promulgate to protect wildlife are encompassed by the phrase "any foreign law" in the Lacey Act.[21] *See United*

---

[21]The defendants also argue that because the Lacey Act is ambiguous as to the meaning of "any foreign law," the rule of lenity requires that any doubt be resolved in their favor. Lenity, however, is "reserved . . . for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *Moskal v. United States*, 498 U.S. 103, 108 (1990) (internal quotation marks omitted); *see also United States v. Curry*, 902 F.2d 912, 915 (11th Cir. 1990).

19

*States v. Lee*, 937 F.2d 1388, 1391–92 (9th Cir. 1991) (holding that a Taiwanese fishing regulation constituted "foreign law"); *594,464 Pounds of Salmon*, 871 F.2d at 828 (holding the same).

As we have determined that the phrase "any foreign law" includes nonstatutory provisions such as Resolution 030-95 and Regulation 0008-93, we now turn to the defendants' argument that their convictions were based upon the district court's erroneous interpretation of foreign law.

## II. Honduran Laws

The defendants contend that the Honduran laws that served as predicates for their convictions were invalid. Specifically, they argue that (1) Resolution 030-95, which established a 5.5-inch size limit for lobsters, never had the effect of law, because it was promulgated improperly and has been declared void by the Honduran courts; (2) Regulation 0008-93, which established inspection and processing requirements for the lobster fishing industry, was repealed in 1995, prior to the time period covered by the indictment; and (3) Article 70(3), which prohibits the harvesting and destruction of lobster eggs, was misinterpreted by the district court and was repealed retroactively in 2001.

---

As our examination of the legislative history clarifies the purpose of and motivation behind the Lacey Act, the defendants' invocation of the rule of lenity fails.

As the defendants were found guilty of conspiracy under a general verdict, there is no way to know which Honduran law the jury relied upon in determining their guilt. Thus, if any of the three Honduran laws that the defendants challenge were invalid during the time period covered by the indictment, the defendants' convictions must be reversed.[22] *See Mills v. Maryland*, 486 U.S. 367, 376 (1988) (In criminal cases, "the [Supreme] Court consistently has followed the rule that the jury's verdict must be set aside if it could be supported on one ground but not on another, and the reviewing court was uncertain which of the two grounds was relied upon by the jury in reaching the verdict.").

We review a district court's interpretation of foreign law de novo. *United States v. Gecas*, 120 F.3d 1419, 1424 (11th Cir. 1997) (en banc). Our determination of foreign law is complicated by the posttrial shift in the Honduran government's position regarding the validity of the laws at issue in this case.[23]

---

[22]The government acknowledges that the rule stated above generally is true, but argues that the defendants are estopped from benefitting from that general rule because they "objected to a special verdict form and requested general verdicts." We disagree. The record indicates that the only objection to the special verdict forms was made by Blandford's attorney, who initially stated that he did not "like" the special interrogatories. Upon hearing the government's explanations for the special verdict forms, none of the defendants made any further objections. Thus, the district court declined to use the government's special verdict forms sua sponte, apparently because it considered them too complicated for the jury members to use in their deliberations.

[23]Despite the fact that Honduran officials supported the government throughout the investigation and trial of this case, the Embassy of Honduras filed an amicus curiae brief in support of McNab.

The Honduran government now maintains that the laws were invalid at the time of the lobster shipments or have been repealed retroactively. Thus, we must decide whether we are bound by the Honduran government's current position regarding the validity of these laws, or whether we are free to follow the Honduran government's original position.[24]

As we begin our analysis, we must make clear that the crux of this case is the validity of the Honduran laws during the time period covered by the indictment. Much of the defendants' arguments focus upon the fact that none of the laws are currently valid; however, their reliance upon the current invalidity of the laws is misplaced. "Although Lacey Act offenses are predicated upon

---

[24]The Executive Branch of the United States government, represented here by the Department of Justice, has taken the position that the various Honduran laws in issue are valid and specifically that under Honduran law the Honduran court's judgment regarding Resolution 030-95 applies only prospectively. The Executive Branch, in effect, has declined to accept the position of the Honduran Embassy as determinative as to Honduran law.

There is no authority directing courts making foreign law determinations to hold as determinative declarations made by foreign embassies as to their laws. Instead, this Court considers the Honduran Embassy's position as evidence of what the Honduran law is in conjunction with the other evidence in this case, which conflicts with the Honduran Embassy's position. Our Executive Branch's decision not to accept as determinative the position of a foreign embassy on foreign law inevitably touches upon considerations of foreign policy, which typically involve nonjusticiable "political questions" committed to the other branches of government. *See Baker v. Carr*, 369 U.S. 186, 211–12 (1962) (recognizing that many questions touching foreign relations are political questions); *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 302 (1918). Such is the case here because a judicial decree that the Honduran Embassy's position is determinative would place this Court in conflict with the Executive Branch with respect to the amount of deference due a foreign government official's position. *See Baker*, 369 U.S. at 217 ("Prominent on the surface of any case held to involve a political question is found . . . the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government . . . .").

22

violations of [foreign] law, the statute nowhere states that a viable or prosecutable [foreign] law violation is necessary to support federal charges. Instead, the Act simply requires that the fish or wildlife have been obtained in violation of any [foreign] law . . . ." *United States v. Borden*, 10 F.3d 1058, 1062 (4th Cir. 1993) (internal quotation marks omitted).[25] The reference to foreign law in the Lacey Act is there to define what constitutes illegal conduct. Thus, the subsequent invalidation of the underlying foreign laws does not make the defendants any less culpable for their actions. If the laws were valid in Honduras during the time period covered by the indictment, the defendants violated the Lacey Act by importing the lobsters in violation of those laws. Whatever changes in the laws occurred after the lobsters were imported into the United States illegally have no effect on the defendants' convictions.

In a Lacey Act prosecution, once the district court determines the validity of a foreign law during a given time period, it is up to the government to prove that

---

[25]In *Borden*, two state statutes served as the predicates for the Lacey Act violations. 10 F.3d at 1062. The defendant "contend[ed] that his indictment [wa]s invalid because the one-year statute of limitations for the predicate state offenses had expired by the time the indictment was returned." *Id.* He argued that the state statute of limitations governed Lacey Act violations, "because the existence of a *prosecutable* violation of state law [wa]s necessary to support a Lacey Act indictment." *Id.* The Fourth Circuit concluded that even though the Lacey Act "incorporates the substantive elements of state law," "it is not designed to incorporate state *procedural* law." *Id.* (internal quotation marks omitted). Thus, although the state statute of limitations had run on the state offense, the defendant's indictment still was valid.

the defendants knowingly violated those laws. *United States v. Todd*, 735 F.2d 146, 151 (5th Cir. 1984). The initial foreign law determination, however, is a question of law for the court. *See* Fed. R. Crim. P. 26.1. "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence." *Id.* Among the most logical sources for the court to look to in its determination of foreign law are the foreign officials charged with enforcing the laws of their country. The district court, in the course of a Lacey Act prosecution, is entitled to rely upon such representations by foreign officials as to the validity of their government's laws. The court reasonably may assume that statements from foreign officials are a reliable and accurate source and may use such statements as a basis for its determination of the validity of foreign laws during a given time period.[26]

---

[26]Although the amici suggest that the government used improper procedures, such as seeking out midlevel employees who were not authorized to render opinions on behalf of the Honduran government in its effort to ascertain the applicable Honduran laws, the record indicates quite the contrary. On February 9, 1999, an NMFS agent sent a formal request to the deputy director of the DIGEPESCA seeking information regarding the legality of the lobster referenced in the anonymous facsimile. The director general of the DIGEPESCA sent two letters to the NMFS in response to the inquiry. In his first letter, dated February 12, 1999, the director general described some of the Honduran laws governing the lobster industry, including Resolution 030-95. In a second letter, dated February 25, 1999, the director general confirmed that the lobsters "ha[d] been illegally transported in violation of the Fishing Law, the Industrial and Hygienic Sanitary Inspection Regulation for Fish Products and Resolution No. 030-95" and included copies of the laws. The director general further stated the he supported all efforts "to legally prosecute natives or legalized Americans that violate the articles of the Lacey Act." The letter

24

When, however, a foreign government changes its original position regarding the validity of its laws after a defendant has been convicted, our courts are not required to revise their prior determinations of foreign law solely upon the basis of the foreign government's new position. There must be some finality with representations of foreign law by foreign governments. Given the inevitable political changes that take place in foreign governments, if courts were required to maintain compliance with a foreign government's position, we would be caught up in the endless task of redetermining foreign law.

In this case, the government solicited and received the assistance of the SAG and the DIGEPESCA during the investigation of the legality of the lobster shipments. From the earliest stages of the investigation until after the defendants were convicted, the statements from the SAG were consistent with the government's understanding of the laws. After the defendants were convicted, however, certain events in Honduras induced the Honduran government to refute its original statements. The newly issued statements and opinions of Honduran

_____

was copied to the minister and vice minister of the SAG. In addition, SAG Minister Guillermo Alvarado Downing confirmed in an affidavit that Secretary General Paz could "provide the necessary advice about and explanation of the enforcement and validity of Honduran laws, and especially the fisheries laws enforced by this Ministry." Thus, it is clear that the government conducted its investigation properly through the Honduran officials who were responsible for interpreting, enforcing, and applying the fishing laws of Honduras.

officials, however, do not persuade us that the district court erred in its determination that the Honduran laws at issue were valid and enforced during the time period covered by the indictment.

By our decision today, we do not mean to impinge upon any foreign government's sovereignty. Honduras has every right to invalidate and repeal the laws at issue in this case. The district courts and the government of the United States, however, have the right to rely upon the Honduran government's original verifications of its laws. We must have consistency and reliability from foreign governments with respect to the validity of their laws. Otherwise, there never could be any assurance when undertaking a Lacey Act prosecution for violations of foreign law that a conviction will not be invalidated at some later date if the foreign government changes its laws. Acceptance of the Honduran government's current interpretation of its laws as determinative of the validity of the laws would set the foundation for future Lacey Act defendants to seek postconviction invalidation of the underlying foreign laws. Although such is not the case here, it is not difficult to imagine a Lacey Act defendant in the future, who has the means and connections in a foreign country, lobbying and prevailing upon that country's officials to invalidate a particular law serving as the basis for his conviction in the United States. Such a scenario would completely undermine the purpose of the

26

Lacey Act. There would cease to be any reason to enforce the Lacey Act, at least with respect to foreign law violations, if every change of position by a foreign government as to the validity of its laws could invalidate a conviction.

Thus, we conclude that the postconviction shift in the Honduran government's position regarding the validity of its laws is not determinative as to whether the laws were valid at the time the lobsters were imported into the United States. We now examine each law in turn to determine whether each was valid during the time period covered by the indictment.

Resolution 030-95

Resolution 030-95, the law establishing the 5.5-inch size limit for lobsters, provides for sanctions for noncompliance with its terms. *See* Resolucion No. 030-95, Dec. 5, 1995, La Gaceta, Jan. 4, 1996. The defendants argue that Resolution 030-95 never was a binding law,[27] because it was not issued in accordance with

---

[27]This argument is inconsistent with McNab's prior acknowledgment of the validity of the 5.5-inch size limit and his instructions to his lobster boat captains to abide by it. In a letter to his fishing boat captains, dated October 28, 1999, McNab advised that "[i]t is absolutely prohibited to capture lobsters under the size allowed by the Law and/or eggbearing lobsters. . . . You will only keep those lobsters measuring more than 5.5-inches." A second letter was sent to the fishing boat captains by the general manager of McNab's company on July 31, 2000. The captains were "reminded to comply with the sizes and weights that the lobster caught must fulfill, which is 5 ½ inches."

Furthermore, throughout the investigation and after the trial, Honduran officials repeatedly confirmed that Resolution 030-95 was a valid and binding law. The director general of the DIGEPESCA confirmed the size limit requirement in three separate letters. Resolution 030-95 was cited by several Honduran officials as a valid and binding law during two trips to Honduras by NMFS agents, one before and one after the defendants' trial. Secretary General Paz

Honduran constitutional procedure.

The basis for the defendants' argument that Resolution 030-95 never was a valid law is an opinion from the Honduran Court of the First Instance of Administrative Law.[28] In May of 2001 the Honduran administrative law court found that Resolution 030-95 had been promulgated through an incorrect procedure and ordered that the resolution was "entirely voided, *but this is only for purposes of [its] annulment and future inapplicability*: This Resolution does not confer any right to claims." R. at 5:324 Ex. B (emphasis added). Subsequently, the Honduran Court of Appeals for Administrative Law affirmed the lower court's decision invalidating Resolution 030-95. R. at 1 Supp.:415 Ex. C.

There are conflicting opinions from Honduran officials as to the effect of the court's annulment of Resolution 030-95 on the defendants' convictions.[29]

---

testified as to the validity of Resolution 030-95 during the pretrial foreign law hearing. Thus, it is evident that Resolution 030-95 was considered binding by those responsible for its enforcement.

[28]After the trial in the district court had begun, McNab filed a petition in the Honduran Court of the First Instance of Administrative Law, seeking to annul Resolution 030-95 on the grounds that the resolution had not been signed by the Honduran president before being issued and that it should have been issued as a decree rather than as a resolution.

[29]The affidavit of the assistant attorney general of Honduras indicates that the decision annulling Resolution 030-95 does not apply retroactively and does not legalize the shipments of undersized lobsters retroactively. The attorney general of Honduras, however, offers an alternative explanation for the prospective language in the court's decision that favors the defendants. He contends that Resolution 030-95 was annulled ab initio, that it never was a valid law and, therefore, cannot serve as a basis for the defendants' convictions. Although the dissent accepts his explanation that Resolution 030-95 never was binding and that the prospective

While we certainly respect the opinions of the Honduran officials, we base our determination that Resolution 030-95 was valid during the time period covered by the indictment upon the Honduran court's opinion. The Honduran court clearly stated that Resolution 030-95 was annulled for prospective application only, and we assume that the Honduran court meant what it said. Although we recognize that Resolution 030-95 is now invalid, we see nothing in the Honduran court's opinion to indicate that the nullification should be applied retroactively.[30] In fact, the decision mandates prospective application.[31] Thus, Resolution 030-95 is a

---

language merely protects the Honduran government from civil liability, we believe that the attorney general is extracting meaning from the Honduran court's decision that is not supported by the language of the opinion. In addition, although a report from the Honduran national human rights commissioner advised that Secretary General Paz's testimony be disqualified as legal error and that Resolution 030-95 be declared void retroactively, a subsequent meeting between the commissioner and an NMFS agent revealed that the commissioner was unaware of the factual background of the prosecution at the time he rendered his report. Furthermore, the commissioner said that he felt "pressured" by McNab's representatives to issue a quick decision.

McNab points to the statement of SAG Minister Downing to support his assertion that aside from Article 96 of the Honduran Constitution, the Honduran appellate court's decision mandates retroactivity. Downing bases his opinion that the invalidation applies retroactively upon an inexplicable assertion that the Honduran appellate court's opinion "expands" the Honduran Court of the First Instance of Administrative Law's opinion and somehow mandates retroactivity. We, however, find nothing in the Honduran appellate court's decision requiring retroactivity, because the Honduran appellate court issued a summary affirmance.

[30]We note that with the permission and approval of the minister of the SAG, both Secretary General Paz and SAG Legal Advisor Jose Bernardo Torres Umanzor confirmed that the Honduran government continued to enforce Resolution 030-95 as a valid and binding law while the appeal was pending before the Honduran Court of Appeals for Administrative Law. They also explained that any annulment of Resolution 030-95 would not be retroactive, because the Honduran court's judgment pertained to an administrative matter, not a criminal matter.

[31]We briefly address the defendants' argument that the Honduran Constitution requires that the invalidation of Resolution 030-95 be applied retroactively in this case. Article 96 of the

valid predicate for the defendants' convictions.[32]

Regulation 0008-93

Regulation 0008-93 was issued pursuant to Decree 40 and required that

lobsters be inspected and processed in Honduras prior to exportation.  *See*

_____

Honduran Constitution provides, "The Law does not have retroactive effect, except in penal matters when the new law favors the delinquent or the person that is prosecuted."  Constitución de la Republicá de Honduras art. 96.  Article 96, however, has no application in this case.  The reason that we look to foreign law in Lacey Act prosecutions is to determine what constitutes illegal conduct.  At the time of the defendants' conduct, harvesting lobsters under 5.5 inches was a violation of Resolution 030-95.  The fact that Honduras now may not hold the defendants liable for past shipments that contained undersized lobsters does not change the fact that those shipments violated then-valid Honduran laws and the Lacey Act.

The government's evidence, both pretrial and posttrial, indicates that because the Honduran court's judgment about Resolution 030-95 involved an administrative matter and not a criminal matter it has no retroactive effect.  Although McNab's evidence, submitted postconviction, may indicate a contrary view, it is clear that a consensus has not been reached on this issue in Honduras.  Nevertheless, we still must determine the best reading of the laws.  *See United States v. Mitchell*, 985 F.2d 1275, 1281 (4th Cir. 1993) ("Perhaps, as is the case with many of our own laws, a consensus has not yet been reached in Pakistan.  Yet we are charged with determining the best reading of the laws.").

In our judgment, the government's evidence and a plain language reading of Article 96 require us to find that Article 96 does not apply in this case and that the invalidation of Resolution 030-95 applies prospectively.  Article 96 expressly provides that "[t]he Law does not have retroactive effect."  This is consistent with the Honduran court's judgment that the invalidation of Resolution 030-95 be applied prospectively.  The only exception under Article 96 is a "new law" in criminal matters.

McNab's view requires a finding that "[t]he Law" in Article 96 applies to judicial declarations of the invalidity of an existing law as opposed to the enactment or promulgation of a "new law."  The language of Article 96 does not support this view.  In the second clause of the sentence, Article 96 specifically refers to a "new law" that favors the accused.  It does not refer to the absence of a law or a declaration that a law is invalid.

[32]The dissent concedes that reversal of the defendants' convictions is not required if the invalidation applies prospectively.  Further, the dissent concedes that "the language of the Honduran Court could be construed to mean prospective application only."  We conclude that the language of the Honduran court opinions requires prospective application only and that nothing else in the record mandates otherwise.

Acuerdo No. 0008-93, Jan. 13, 1993, La Gaceta, Apr. 7, 1993. In January of 1995 the Congreso Nacional enacted Decree 157-94, which repealed and replaced several existing statutes, including Decree 40. *See* Decreto No. 157-94, Nov. 15, 1994, La Gaceta, Jan. 13, 1995. In December of 1999 the Secretaria de Recursos Naturales y Ambiente issued Accord 1081-99, an administrative regulation that contained updated inspection and processing requirements and expressly repealed Regulation 0008-93. *See* Acuerdo No. 1081-99, Sept. 23, 1999, La Gaceta, Dec. 2, 1999.

On the basis of their posttrial research, the defendants argue that Regulation 0008-93 was repealed along with Decree 40 in 1995.[33] They contend that the repeal of Decree 40 operated to repeal the regulations promulgated under it, including Regulation 0008-93. The defendants argue that the automatic repeal of regulations triggered by the repeal of the statute under which those regulations were promulgated is a longstanding principle of Honduran law, and they rely upon a recent interpretive decree by the Congreso Nacional for support. *See* Decreto

---

[33]The defendants also raise a second challenge with respect to the propriety of Regulation 0008-93 as a Lacey Act predicate. They argue that even if Regulation 0008-93 were not repealed until 1999 it falls outside the scope of the Lacey Act, because it is not a law regulating the taking, possessing, transportation, or sale of wildlife. We disagree. When Congress amended the Lacey Act in 1981, it expressly stated that the Act covers laws "relating or referring to fish or wildlife or plants." S. Rep. No. 97-123, at 5; *see also United States v. Lewis*, 240 F.3d 866, 869 (10th Cir. 2001) (per curiam); *Lee*, 937 F.2d at 1392. Accordingly, our review of the regulation confirms that it unquestionably relates to fish and is within the scope of the Lacey Act.

No. 198-2001, Nov. 1, 2001. That decree expressly provides that "the express total or partial repeal of a law leaves without legal value or effect the general regulations and the specific regulations totally . . . that the Executive Branch through the respective Secretariat of State has issued to implement the provisions of the repealed Law . . . ." *Id.*

We are unconvinced by the defendants' argument for two reasons. First, we question why there is a need to issue an interpretive decree if the concept of an automatic repeal of regulations is such a longstanding principle of Honduran law.[34] Second, Regulation 0008-93 was repealed *expressly* by the Secretaria de Recursos Naturales y Ambiente in 1999 when it issued new rules for lobster fishing. There would be no need to repeal Regulation 0008-93 expressly in 1999 if it was repealed automatically in 1995.

Furthermore, the Honduran Civil Code provides support for the proposition

---

[34]The evidence in the record contradicts this assertion and establishes that the Honduran government regarded the hygiene regulation as valid between the time of the 1995 repeal of Decree 40 and the 1999 express repeal of Regulation 0008-93. The March of 2000 statements by the Honduran legal advisors described the processing requirements mandated by Regulation 0008-93 *and* Decree 157-94, the very same decree that the defendants contend repealed Regulation 0008-93 in 1995. At the pretrial foreign law hearing, the SAG's Secretary General Paz testified as to the validity of the processing and inspection requirements. Secretary General Paz stated that Regulation 0008-93 continued to be enforced in Honduras, because it was only tacitly repealed in 1995.

that Regulation 0008-93 remained in effect until the express repeal in 1999.[35]
According to the Civil Code, a law may be repealed totally or partially by another law. Código Civil art. 42. Such a repeal may be express or tacit; it is express when the new law expressly provides that it repeals the previous one, and it is tacit when the new law's provisions cannot be reconciled with the previous law. Código Civil art. 43. Significantly, a "tacit repeal leaves in effect in the previous law anything not in conflict with the provisions of the new law, even though both versions may cover the same matters." Código Civil art. 44. The 1995 decree did not repeal Regulation 0008-93 expressly, which means that any repeal of the regulation was tacit. As Regulation 0008-93 did not conflict with the 1995 decree, it remained in effect until the 1999 regulation expressly repealed it. Thus, the district court properly determined that Regulation 0008-93 was valid during the time period covered by the indictment.

Article 70(3)

Article 70(3) of the Fishing Law prohibits the harvesting or destruction of

---

[35]Not only does the Honduran Civil Code support the district court's determination that Regulation 0008-93 was valid during the time period covered by the indictment, the defendants' interpretation leads to an illogical result. An automatic repeal of Regulation 0008-93 in 1995 would have created a four-year window during which there were no sanitary regulations for lobster fishing. This would have been an odd result considering that the 1995 decree issued by the Congreso Nacional was intended to strengthen the hygiene requirements.

lobster eggs. *See* Decreto No. 154, May 19, 1959, La Gaceta, June 17, 1959. The defendants argue that Article 70(3) does not prohibit the destruction or collection of lobster eggs for profit. They contend that the district court's interpretation that the law prohibited the harvesting of the egg-bearing species themselves was erroneous.[36]

We fail to see how Article 70(3) can be read other than to prohibit the destruction or harvesting of the eggs of lobsters for profit. The destruction of eggs to sell the female lobsters appears to be a clear violation of Article 70(3), which provides for punishment by fine or imprisonment to "[t]hose who destroy or harvest the eggs, or the offspring of fish, chelonians or other aquatic species for profit." *Id*. The defendants' argument regarding the legality of capturing egg-bearing lobsters is contrary to the plain language of Article 70(3).[37]

---

[36]Lobsters have swimming legs on their abdomens called swimmerets, which female lobsters use to hold eggs. 7 *The New Encyclopedia Britannica* 430 (15th ed. 1998). The swimmerets of some of the lobsters in the seized shipment were clipped off and the eggs were removed.

[37]Not only is their interpretation contrary to the plain language of Article 70(3), it directly conflicts with McNab's own instructions to his boat captains that harvesting egg-bearing lobsters was prohibited. The October 1999 letter from McNab to his fishing boat captains provided that "[i]t is absolutely prohibited to cut the pleopods of the Lobsters to remove any eggs . . . . All the lobsters with eggs will be returned to the sea without any exception. For that purpose, you will have to instruct the fisherman who work in the boats on how to identify them." The letter from McNab's general manager to the captains in July of 2000 instructed that they may "not capture lobsters that are in their reproductive phase or gravid lobsters (with eggs). It is absolutely prohibited to remove egg sacs from the lobster to remove its eggs . . . ."

The defendants also argue that Article 70(3) was repealed retroactively in February of 2001 by the enactment of Decree 245-2000 by the Congreso Nacional. As stated above, our duty with respect to each of the Honduran laws is to determine whether they were valid during the time period covered by the indictment. Whether the 2001 amendment to Article 70(3) repealed the prohibition against harvesting egg-bearing lobsters for profit is not our concern. Thus, we reject the defendants' argument that Article 96 of the Honduran Constitution requires that we apply the 2001 amendment retroactively for the reasons stated with respect to Resolution 030-95. Accordingly, we conclude that Article 70(3) was a proper predicate for the defendants' convictions.

Thus, the defendants' newfound support from the Honduran government does not change the fact that during the time period covered by the indictment, the laws at issue were valid. Although we certainly respect the Honduran government's position, the recent developments since the trial and the newly rendered opinions from Honduran officials cannot turn what were illegal lobster shipments into legal lobster shipments retroactively.

Having determined that Resolution 030-95, Regulation 0008-93, and Article 70(3) were valid during the time period covered by the indictment and thus were proper predicates for the Lacey Act charges, we now briefly address the

35

defendants' remaining issues on appeal. The defendants argue that (1) the district court abused its discretion by excluding evidence at trial relating to McNab's "knowledge" of Honduran law; (2) the district court made several errors with respect to the jury instructions; (3) there was insufficient evidence to support the jury's verdicts; and (4) the district court erred in failing to postpone Schoenwetter and Blandford's sentencing and in determining the length of their sentences. After thoroughly reviewing the record, we find that these issues are without merit.

CONCLUSION

Thus, we conclude that the Honduran laws used as the underlying predicates for the defendants' convictions fall within the scope of the Lacey Act and were valid and legally binding during the time period covered by the indictment. The remaining issues raised by the defendants were decided properly by the district court or are without merit. We therefore AFFIRM the defendants' convictions and sentences.

FAY, Circuit Judge, dissenting:

The majority opinion is both thorough and scholarly in dealing with this complicated matter. With some hesitation, I most respectfully dissent from that portion of the majority opinion upholding the validity of Honduran Resolution 030-95. The theme of the majority opinion is that the government of Honduras has "shifted" its position. The question for determination is phrased as being complicated by the changed or new position of the Honduran government. The majority then decides this issue within the framework of whether or not we are free to follow the Honduran government's original position.

Try as I might, I simply cannot read this record that way. There was never unanimity nor agreement concerning the validity of Resolution 030-95. That question was hotly contested. But, throughout the course of this litigation, the resolution of that question was based upon the weight given by the trial judge to the evidence presented by the U.S. government during a pretrial hearing on foreign law. At that time, the Honduran courts had not ruled. Now they have.

It should come as no surprise to anyone that some of the "expert" witnesses were correct and some were wrong. Nor should we be surprised that it was the courts of Honduras which ultimately answered the question. That is the way it works in Honduras and in the United States of America. Simply stated, it is my

37

position that we are bound by the rulings of the Honduran courts declaring Resolution 030-95 null and void. This being the case, the defendants convictions must be reversed since one of the Honduran laws relied upon by the jury in finding guilt has now been found to be a nullity.

Most respectfully, I disagree with the majority's conclusion that the government of Honduras has changed its position. Government officials testified on both sides of the issue before the district court. There was no one official voice for the government of Honduras. But, there is now. The Honduran courts have ruled and the Honduran Embassy has filed an *amicus* brief advising us of the Honduran government's position - <u>Resolution 030-95 is null and void and was so during the critical time charged in the second superceding indictment</u>. That is the <u>only</u> official government position I am aware of in this record.

We all agree that the key component to any alleged Lacey Act § 3372(a)(2)(A) violation is the commission of a predicate State or Foreign offense concerning fish or wildlife. We further agree that, for purposes of these appeals, three predicate offenses are pertinent. Of those three, my concern goes to Resolution 030-95 concerning the minimum legal size of harvested lobster tails.

As the majority correctly notes, the district court properly conducted a foreign law hearing to determine whether Resolution 030-95 was, in fact, a valid

38

Honduran law during the time period charged in the second superseding indictment. Over the testimony of an expert in Honduran law, a Honduran law professor and former Ministry of Justice, the then Attorney-General of the Republic of Honduras, the Honduras Bar Association and others, the District Court, based upon the testimony of one lower-level Honduran government official, Liliana Paz, Secretary General of the Ministry of Agriculture and Livestock, concluded that Resolution 030-95 was a valid law.

Following trial and conviction, defendant David Hensen McNab ("McNab") challenged the validity of Resolution 030-95 in the Court of First Instance of Administrative Law in Honduras ("Honduran Court"). That challenge was opposed by an attorney representing the government of Honduras. At the conclusion of that proceeding, the Honduran Court declared Resolution 030-95 to be null and void. Specifically, on May 23, 2001, the Honduran Court found:

> First: . . . [Resolution 030-95] [does] not conform to law
> by virtue of having violated the legal code at the time [it]
> [was] issued. Second: the challenged [Resolution] . . . ,
> No. 030-95 of December 5, 1995, [is] entirely voided,
> but this is only for purposes of [its] annulment and future
> inapplicability: This Resolution does not confer any right

39

to claims.

R. at 5:324 Ex. B.  The Honduran Court premised its decision on the fact that Resolution 030-95 was not properly issued by the President of the Republic of Honduras and authorized by the proper Secretary or Under Secretary of State as is required under Honduran law.  Subsequently, the government of Honduras appealed the Honduran Court's ruling to the Court of Appeals of Administrative Matters ("Honduran Court of Appeals") which on October 11, 2001, confirmed the correctness of the Honduran Court's decision.

The rulings of the Honduran courts do raise a second question as to whether or not the ruling applies retroactively.  As quoted above, the language of the Honduran Court could be construed to mean prospective application only.  That is the position the majority takes in this case.  Therefore, the critical question before this court is whether or not Resolution 030-95 was valid at the time of the defendants' conduct as charged in the second superceding indictment.  This question is determined by whether the invalidation of Resolution 030-95 is to be applied retroactively or prospectively.  If the invalidation of Resolution 030-95 is to be applied retroactively, it seems to me that reversal of the defendants' convictions is mandated.  If invalidation is to be only applied prospectively,

reversal is not required.

We all agree that we review a district court's interpretation of foreign law *de novo*. *United States v. Gecas*, 120 F.3d 1419, 1424 (11th Cir. 1997) (en banc). We also agree that under certain circumstances an underlying Lacey Act predicate offense need not be independently prosecutable. *See United States v. Borden*, 10 F.3d 1058 (4th Cir. 1993) (affirming Lacey Act conviction where the enforcement of underlying predicate state law was barred by applicable state statute of limitations but not by federal statute of limitations). However, *Borden*, or any similar case, is fundamentally different than this case where the predicate substantive criminal law supporting the Lacey Act convictions cannot be enforced, not because of a procedural bar, but because the law itself has been invalidated by the courts through nullification. In other words, what was thought to be a crime turns out to not be a crime under Honduran law. It bears noting that had U.S. law been implicated, reversal of the convictions would not be in question and the case would easily be resolved in the defendants' favor. In the United States, where a substantive criminal law is subsequently declared to be invalid by the courts, any convictions thereon would be reversed.

Further troubling is the fact that as a matter of Honduran constitutional law, these defendants could not be tried and convicted for violation of Resolution 030-

41

95 in Honduras. In Honduras, as in the United States, any criminally enforceable statute later declared to be invalid by the courts is retroactively applied to any criminal defendant. Article 96 of the Honduran Constitution specifically provides, "[t]he Law does not have retroactive effect, except in penal matters when the new law favors the delinquent [(i.e., criminally convicted)] or the person that is prosecuted." Constitución de la Republicá de Honduras art. 96.

The majority makes note of Article 96 but simply asserts its inapplicability by concluding that "[a]t the of time the defendants' conduct, harvesting lobsters under 5.5 inches was a violation of Resolution 030-95." As stated above, if the invalidation of Resolution 030-95 is retroactively applied, as I believe it must be, then at the time of the defendants' conduct, there would not have been a violation of Resolution 030-95. To this point, there are authorities in the record which I find particularly relevant in deciding whether the Honduran Court's invalidation of Resolution 030-95 should be retroactively applied.

We start with the official voice of Honduras in the United States. The country of Honduras, through its Embassy in Washington, D.C., has filed an *amicus* brief stating unequivocally that retroactive application is the law of Honduras. The current Attorney General of the Republic of Honduras, Sergio Zavala Leiva, the National Human Rights Commissioner of the Republic of

42

Honduras, Leo Valladares Lanza,[1] the current Secretary of State of the Offices of Agriculture and Livestock, Guillermo Alvarado Downing and Secretary Downing's subordinate and star U.S. government witness before the district court, Secretary General of the Ministry of Agriculture and Livestock, Liliana Paz, all support the position that retroactive application is required. The only witness presented suggesting that retroactive application is not required is Juan Arnaldo Hernandez Espinoza, an Assistant Prosecutor General of the Public Ministry of the Republic of Honduras.[2] Thus, the overwhelming evidence before this court is squarely on the side of the retroactive application of the invalidation of Resolution 030-95. I can come to no other conclusion.

---

[1] Although his opinion was never altered, amended or changed in any manner, the majority notes that a National Marine and Fisheries Service agent who interviewed Commissioner Lanza indicated that Commissioner Lanza revealed that he felt "'pressured' by McNab's representatives to issue a quick decision."

[2] In his opinion, Assistant Attorney General Espinoza ("Espinoza") indicates that there is no retroactive application of the invalidation of Resolution 030-95 because "the sanction to which [the defendants'] conduct applies is based on a measure that originates in the Fishing Law and not in the activity of the Executive Branch." Appellee's Addendum of Foreign Law Materials at tab 1. Upon closer examination, it becomes clear that Espinoza's opinion is premised on the assumption that the Fishing Law, not Resolution 030-95, defines the minimum lobster harvest size. Therefore, invalidation of Resolution 030-95, a resolution implemented pursuant to the authority of the Fishing Law, is without import and the question of retroactivity is rendered irrelevant. This opinion is mistaken for two critical reasons. Firstly, Espinoza's opinion ignores the fact that, for purposes of U.S. law, the predicate act the defendants were charged with violating is Resolution 030-95, not the Fishing Law. Secondly, Espinoza's opinion ignores the fact that, with regard to minimum lobster harvest size, the Fishing Law is silent and directs such restrictions to be fashioned pursuant to regulation. *See* Decreto No. 154, May 19, 1959, La Gaceta, June 9, 1959, art. 70.

As to the appropriate interpretation of the Honduran Court's use of the terms "annulment" and "future inapplicability," Attorney General Leiva provides the most reasoned and reasonable explanation. Attorney General Leiva explains:

> The reason that the laws of Honduras and, in particular, the Court of Administrative Appeals, with its specific language in its judgment, only set forth its future inapplicability is to guarantee the legal security of the State, protecting it from damages and losses that could have been caused by the enforcement of an act that is null and void as a matter of law.

(Leiva Decl. ¶ 8).

Apparently, in Honduras the government may be subject to civil liability for the enforcement of a subsequently declared invalid law. Therefore, in the context of Honduran law, the Honduran Court's language makes sense and simply seeks to limit the government's liability and protect its treasury. The precise language of the Honduran Court supports this interpretation. Following the use of "annulment" and "future inapplicability" is a colon followed by the following illuminating language, "[t]his Resolution does not confer any right to claims." Thus, Attorney General Leiva's explanation, as compared to the other evidence before the court, is most compelling. Furthermore, this court should not interpret Honduran law in a vacuum. As stated above, in Honduras, Article 96 of the Honduran Constitution retroactively applies the invalidation of Resolution 030-95

44

to any criminal defendant. The Honduran Court certainly would have been aware of the existence and effect of Article 96 when crafting the language and scope of its opinion and this court should seek to interpret the Honduran Court's opinion in its proper context.

The majority advances the important principle of finality in support of its decision. As a general proposition, I agree that finality is an important aspect of American jurisprudence. However, in the context of an invalidated substantive criminal law which forms the basis of a criminal prosecution or conviction, reliance on the concept of finality is misplaced. As stated above, under both U.S. and Honduran law, retroactive application is warranted for a criminal defendant charged or convicted of a subsequently declared invalid criminal statute. *Cf.*, *Davis v. United States*, 417 U.S. 333, 346, 94 S. Ct. 2298, 2305, 41 L. Ed. 2d 109, 119 (1974) (in the context of a petition for relief pursuant to 28 U.S.C. § 2255, concluding that if conviction and punishment are for an act not made criminal by the law, "[t]here can be no room for doubt that such a circumstance inherently results in a complete miscarriage of justice . . . ." (Internal quotations omitted)).

For emphasis, I repeat again that the majority opinion discusses extensively and is strongly critical of the changed position or shift by the Honduran government. While that terminology may give comfort to the majority, it is simply

not accurate. While various government officials gave conflicting opinions regarding the validity of Resolution 030-95, this was before the Honduran courts ruled. The Honduran courts have now ruled and both agree, Resolution 030-95 was null and void. The majority casts this in an unfavorable light akin to something sinister. In my opinion, this is no different than what occurs routinely in our country. Attorneys, and even the Attorney General of a state or the United States, often express opinions about statutes only to find that after a court challenge, they were wrong. That is all that happened here. Some of the experts were right; some were wrong. But, the Honduran courts have now spoken and there is simply no doubt that Resolution 030-95 is null and void as if it never existed.

To suggest that the newly issued statements and opinions of Honduran officials do not carry the weight of the earlier statements is a strange position for members of the judiciary. The so-called "shift in position" is the result of lawful litigation within the courts of a foreign nation. I think we would be shocked should the tables be reversed and a foreign nation simply ignored one of our court rulings because it caused some frustration or inconvenience.

The evidence in this case supports the conclusion that the defendants were guilty of knowingly violating the law at the time they harvested, shipped and sold

these "shorts." The prosecutors did their very best to establish the law of Honduras which is essential under the Lacey Act. It is easy to understand the frustration inherent in this present situation. But, the Lacey Act, by its very terms, is dependent upon the laws of a foreign sovereign. In this situation, we do not control the outcome of challenges made to those underlying laws. No one has suggested that McNab was not exercising his lawful rights as a citizen of Honduras or that the courts of Honduras were without authority to issue the decisions they did.

Most reluctantly, I therefore dissent.