**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**594,464 POUNDS OF SALMON, more
or less, Defendant.**

**Appeal of UNION, INC., Claimant.**

**No. 87–4142.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1988.

Decided March 28, 1989.

825

Hall Baetz, Davis, Wright & Jones, Seattle, Wash., for claimant-appellant.

Sarah P. Robinson, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

James P. Leape, Washington, D.C., for amicus curiae World Wildlife Fund.

Before TANG, THOMPSON and O'SCANNLAIN, Circuit Judges.

O'SCANNLAIN, Circuit Judge:

We are asked to decide whether a determination by the Board of Foreign Trade of the Republic of China (Taiwan) prohibiting export of salmon without a permit constitutes "foreign law" within the meaning of the Lacey Act, 16 U.S.C. § 3371 *et seq.* ("Act").

The United States initiated this *in rem* forfeiture action after seizing 594,464 pounds of salmon in July 1986 at Tacoma, Washington, its point of importation into the United States. Union, Inc. ("Union"), a California corporation, claims to own the salmon.

The government charges that the salmon's importation triggered operation of 16 U.S.C. § 3374 (1982),[1] which provides for the forfeiture of certain fish imported into the United States in violation of "any foreign law." *See also* 16 U.S.C. § 3372 (1982). United States officials allege that the fish were exported from Taiwan in violation of a Taiwanese regulation,[2] and that the importation of the salmon into the United States was part of a complex international fish smuggling scheme.

Union moved to dismiss the government's forfeiture action, asserting that the Taiwanese regulation at issue is not encompassed by the term "any foreign law" as it used in section 3372(a)(2)(A). Later, Union filed another motion to dismiss in which it asserted that application of the forfeiture provision violates the constitutional safeguard against vagueness. The district court denied both motions to dismiss. *United States v. 594,464 Pounds of Salmon,* 687 F.Supp. 525 (W.D.Wash.1987). The case comes before this court on interlocutory appeal to determine certain unsettled, yet controlling, questions of law. *See* 28 U.S.C. § 1292(b) (Supp. IV 1986).

I

In construing a statute, this court first looks to the plain meaning of the language in question. *United States v. Hurt,* 795

---

1. The relevant text of section 3374 reads as follows:

> All fish or wildlife or plants imported, exported, transported, sold, received, acquired, or purchased contrary to the provisions of section 3372 of this title (other than section 3372(b) of this title), or any regulation issued pursuant thereto, shall be subject to forfeiture to the United States....

16 U.S.C. § 3374(a)(1).

2. Although "regulation" is not a precise translation of what the Taiwanese Board of Foreign Trade issued, we will use the term for the sake of simplicity.

The Taiwanese governmental system is composed of five branches, or "Yuans," among which are the Executive and Legislative Yuans.

The Executive Yuan consists of various Taiwanese ministries including the Ministry of Economic Affairs. The Board of Foreign Trade is a subsidiary of this Ministry and is authorized to regulate exportation of goods. The normal method by which the Board regulates exports is to designate goods as "permissible," "controlled," or "prohibited." Goods that lie within the "controlled" category, including salmon of the type seized here, require the Board's express approval before they may be exported. The Board has not granted a permit approving the export of such salmon since issuing its Announcement that salmon would be a controlled export. *See* Taiwanese Public Announcement No. Mao (72) Huo Fa 26507.

F.2d 765, 770 (9th Cir.1986), *amended,* 808 F.2d 707 (9th Cir.), *cert. denied,* — U.S. —, 108 S.Ct. 69, 98 L.Ed.2d 33 (1987) (citing *North Dakota v. United States,* 460 U.S. 300, 312, 103 S.Ct. 1095, 1102, 75 L.Ed. 2d 77 (1983)). If the language is unambiguous, its plain meaning controls unless Congress has "clearly expressed" a contrary legislative intention. *Id.*

■ The relevant statutory language is as follows:

It is unlawful for any person ... to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any fish or wildlife taken, possessed, transported, or sold in violation of any law or regulation of any State or *in violation of any foreign law....*

16 U.S.C. § 3372(a)(2)(A) (1982) (emphasis supplied).

If one focuses on the three-word phrase "any foreign law," as the district court did and as the government urges us to do, then an ambiguity likely does not arise. The "plain meaning" of the word "law," as commonly used and generally understood, is fairly broad in scope. Black's Law Dictionary, which the district court cited in support of its position, defines law, in its "generic sense," as "a body of rules of action or conduct prescribed by controlling authority, and having binding legal force.... That which must be obeyed and followed by citizens subject to sanctions or legal consequences is a law." *Black's Law Dictionary* (5th ed. 1979). If one were to employ this definition of the word "law," the phrase "any foreign law" would certainly incorporate the Taiwanese regulation.[3] Because the legislative history does not expressly preclude such an interpretation, *see infra* at 828–29, if we choose

to make such a reading, the judicial inquiry is complete. *See Burlington Northern Railroad Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 107 S.Ct. 1855, 1860, 95 L.Ed.2d 404 (1987); *Hurt,* 795 F.2d at 770.

■ Whether a regulation constitutes "law," however, depends on the structure of the particular statute. *Singer v. United States,* 323 U.S. 338, 345, 65 S.Ct. 282, 286, 89 L.Ed. 285 (1945). Thus, we step back to view the relevant language in the context of the statutory framework.

Union bases its statutory language arguments on the fact that the specific subsection at issue makes an explicit reference to "any law or regulation" when referring to state law, but fails to mention "regulation" when referring to "any foreign law." 16 U.S.C. § 3372(a)(2)(A) (1982) (making it unlawful to import, export or acquire "[a]ny fish or wildlife taken, possessed, transported or sold in violation of any law or regulation of any State or in violation of any foreign law"). Union thus argues that to read "any foreign law" broadly to include a foreign regulation renders the word "regulation" superfluous in the phrase "in the violation of any law or regulation of any State." Union contends, therefore, that a narrower "statutory" reading of "any foreign law" is required.

Union further claims that the government's interpretation impermissibly assigns a different meaning to two references to the word "law" in the same sentence, in violation of both the well-established principle and a clear manifestation of congressional intent.[4] Finally, Union claims that because Congress employed the word "regulation" when defining the scope of the statute in regard to state law violations,

---

3. The Supreme Court adopted such a broad interpretation of the term "law" when construing the Black Bass Act, Act of May 20, 1926, as amended, previously codified at 16 U.S.C. §§ 851–56 (repealed 1981). *United States v. Howard,* 352 U.S. 212, 219, 77 S.Ct. 303, 307, 1 L.Ed.2d 261 (1957). In *Howard,* the Court held that the phrase "law of the State" was "sufficiently broad to encompass" rules and regulations the Florida Game and Fresh Water Fish Commission had issued. The weight of this holding is limited here, however, because the

Black Bass Act drew no distinction between laws and regulations.

4. Union points to the following floor statement made just prior to passage of the Act in the Senate: "The amendment to subsection 2(d) [now § 3371(d) ] clarifies that the term 'law,' as used in this bill, has the same meaning whether we are referring to a law of the United States, a law of a State, a foreign law, or an Indian tribal law." 127 Cong.Rec. 17,329 (1981) (comments of Sen. Chafee).

this court should grant a certain amount of significance to the fact that Congress chose not to employ it in regard to foreign law violations.[5]

While they do not compel a ruling in Union's favor,[6] these arguments nonetheless lead to a separate plausible interpretation for the term "any foreign law" that does not encompass the Taiwanese regulation. Thus, when this alternative interpretation is measured against the more focused "three-word" analysis, an ambiguity results, making a foray into the realm of legislative history necessary.

### Legislative History

Where, as here, each of several different interpretations can be reconciled with the statutory language, our duty is " 'to find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " *Commissioner v. Engle*, 464 U.S. 206, 217, 104 S.Ct. 597, 603, 78 L.Ed.2d 420 (1984) (quoting *NLRB v. Lion Oil Co.*, 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part and dissenting in part)). Even if we were convinced that a careful statutory analysis of section 3372

unambiguously led to the conclusions that Union suggests we draw, such conclusions cannot stand if they are in opposition to clearly expressed legislative intent. *California v. Kleppe*, 604 F.2d 1187, 1194 (9th Cir.1979).

Congress's passage of the 1981 Amendments to the Lacey Act represented the latest in a series of modifications to the original Act and the Black Bass Act, all of which expanded the scope of the statutes. The 1981 Amendments in particular were passed in response to Congress's frustration at the inadequacy of the Lacey and Black Bass Acts, as then written, to control effectively the burgeoning and highly profitable trade in illegal fish and wildlife.[7]

Thus, it cannot be said that Congress omitted "regulation" in the definition of "any foreign law" because it wanted to *limit* the Act's applicability. For example, because of the wide range the forms of law may take given the world's many diverse legal and governmental systems, Congress would be hard-pressed to set forth a definition that would adequately encompass all of them. Moreover, if Congress were to have included explicitly "foreign regulation," then the door would have been opened for alleged violators to argue that the Act's forfeiture provision is not trig-

---

**5.** These arguments are addressed in detail, *infra* at 828–829.

**6.** Nor do we find conclusive the balance of Union's arguments. First, we conclude that in setting forth a separate definition of Indian tribal law in section 3371(c), Congress's intent was not to *expand* the scope of the term "Indian tribal law" so as to ensure that it included regulations, but rather was to *limit* its scope so that the term did not apply to extra-tribal regulations.

That is, it appears as if Congress did not want to limit the Act's application based on the *form* of law the tribe has enacted; instead, the limitations it wanted drawn were to be based on the *scope* of the tribal law at issue.

Second, Union contends that to interpret the word "law" broadly enough so as to bring within its purview the Taiwanese regulation does violence to another "canon" of statutory construction—that "forfeiture statutes" be narrowly construed. The status of this principle is not as well-settled as most of the others that Union invokes, however. This court recently neglected to embrace the proposition that statutes impos-

ing civil forfeiture need be as carefully tailored as those meting out criminal penalties when it had a clear chance to do so. *See United States v. $122,043 in United States Currency*, 792 F.2d 1470, 1477 (9th Cir.1986).

Even were we to apply this "rule" here, however, such an application does not compel a reversal. Indeed, the Court recently noted that "[t]he strict construction principle is merely a guide to statutory interpretation.... [and is only to be used] 'as an aid for resolving an ambiguity; it is not to be used to beget one.' " *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 491 n. 10, 105 S.Ct. 3275, 3282 n. 10, 87 L.Ed.2d 346 (1985) (quoting *Callanan v. United States*, 364 U.S. 587, 596, 81 S.Ct. 321, 327, 5 L.Ed.2d 312 (1961)).

**7.** *See, e.g.*, Senate Environment and Public Works Committee Report, 1981 U.S.Code Cong. & Admin.News (97 Legislative History) 1748, 1751 (part of General Statement at beginning of Senate Report No. 97–123); 127 Cong.Rec. 17,327 (July 24, 1981) (remarks of Sen. Chafee); 127 Cong.Rec. 26,537 (Nov. 4, 1981) (remarks of Rep. Breaux).

gered by violation of a "law" (in the broad sense) that does not fall easily into either "law" (in the more narrow "statutory sense") or "regulation" categories. Thus, if Congress had sought to define "any foreign law" with any kind of specificity whatsoever, it might have effectively immunized wildlife smugglers from enforcement under the Act despite violation of conservation laws of a large portion of the world's regimes that possess systems of law and government that defy easy definition or categorization.

In addition, such a reading works to immunize even a large portion of those smugglers in violation of laws of foreign countries that do have a system that fits within the "laws/regulations" rubric. That is, because much of the enforcement of wildlife conservation laws is performed by "agencies," or their equivalent, as in this case, the rules such bodies generate would also be beyond the scope of the Act. In sum, if, as Union argues, Congress had not wanted to include at least foreign regulations within the scope of the Act, it would have in large measure gutted the statute.

Further, Congress's desire to expand the scope of the Act serves to explain why it retained the term "regulation" when referring to state and federal law, while at the same time not rendering the term "mere surplusage." Congress's primary goal was to assist states and foreign governments in the enforcement of their wildlife conservation laws. If Congress had not included regulation when referring to state and federal laws, when agencies play such a large role in these systems of government, then alleged violators could have argued with some force that Congress did not mean to include domestic regulations within the purview of the Act, but rather that Congress meant for "laws" to have a narrow meaning, thereby applying solely to statutes and quasi-statutes, but not to regulations.

Union argues that because Congress was seeking to "put more teeth" into the Lacey Act upon passage of the 1981 Amendments, it purposely wanted to omit anything beyond the scope of "foreign law" (in its narrow sense) from its application. Congress therefore sought to limit the scope of section 3372 because it did not want to penalize "innocent" international shippers for minor technical violations of little-known foreign regulations.

Union is correct in asserting that Congress was concerned about such a scenario. But it apparently decided to address the problem in another way. For example, in seeking to ensure the effectiveness of its measures, Congress provided for strict liability for violations leading to civil forfeitures, from which one can infer that it placed the burden of assuring compliance with foreign law on the wildlife transporter. This does not lead to an overly onerous result; in fact, it mirrors the analysis we recently gave to a similar civil forfeiture provision. See United States v. Fifty-Three (53) Eclectus Parrots, 685 F.2d 1131, 1134 (9th Cir.1982).

In sum, the statutory language "any foreign law" cannot be said to be unambiguous when read in the context of the entire subsection. While the legislative history is not totally one-sided, the thrust of Congress's intention in amending the Act was to expand its scope and enhance its deterrence effect. To read the term as Union urges risks severely limiting the scope of the Act. Thus, we are convinced that the Act's term "any foreign law" necessarily encompasses the Taiwanese regulation.

## II

Even if the Act encompasses some foreign regulations, Union contends that it does not encompass the Taiwanese provision because it only provides for the imposition of civil sanctions. In support of its position, Union cites a case involving a federal statute that made it a federal offense to violate state gambling laws. United States v. Gordon, 464 F.2d 357 (9th Cir.1972). In Gordon, this court held that dismissal of indictments under the statute was proper when the defendants were charged with violations of a state regulation that provided for civil sanctions only. Id. at 358.

This argument is not persuasive, however. First, *Gordon* is distinguishable because it involved a criminal action. More important, as the following passage from the legislative history makes clear, Congress intended the 1981 Amendments to apply to "laws" that have nothing more than civil fines for penalties.

Relatively minor violations, such as those that do not involve commercial activity, importation, exportation, or wildlife with a market value in excess of $350, do not necessarily subject the alleged violator to a maximum civil penalty of $10,000. In those instances, the civil penalty may not exceed the maximum penalty provided for in the underlying law, or $10,000, whichever is less. Thus, *if a state law provides for a maximum civil penalty of $450* for the illegal taking of ducks and the market value of the duck or ducks involved in a violation of this Act does not exceed $350, the maximum civil penalty under this Act for the illegal interstate transportation of said duck or ducks would be $450.

S.Rep. No. 97–123, 97th Cong., 1st Sess. 9–10, *reprinted in* 1981 U.S.Code Cong. & Admin.News 1748, 1756–57 (emphasis supplied). Union attempts to discount this language by arguing that it does not refer explicitly to a statute where the *only* sanctions are those civil in nature. If Congress had wanted the statute to be applied with such exacting precision, however, it would have so stated.

### III

To pass constitutional muster against a vagueness attack, a statute must give a person of ordinary intelligence adequate notice of the conduct it proscribes. A statute's application may violate the constitutional mandate against vagueness if its terms are insufficiently clear; here, the issue is whether the term "any foreign law" in the Act is sufficiently clear so as to have provided Union with "fair warning." *Grayned v. City of Rockford*, 408 U.S. 104, 108–09, 92 S.Ct. 2294, 2299, 33 L.Ed.2d 222 (1972) (*quoted in United States v. Hutson*, 843 F.2d 1232 (9th Cir.1988)).

■ A statute providing for civil sanctions is reviewed for vagueness with somewhat "greater tolerance" than one involving criminal penalties. *See Village of Hoffman Estates v. Flipside, Hoffman Estates*, 455 U.S. 489, 498–99, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). And while the Act does provide for criminal sanctions in certain instances, it also requires a showing of *scienter* in those cases, a requirement which tends to mitigate a law's potential vagueness. *Id.* at 499, 102 S.Ct. at 1193.

■ Tested by these principles, the Act is not unconstitutionally vague;[8] Union should at least have been aware of the strong possibility that violation of a foreign regulation would trigger the forfeiture provision of the Act; this is especially true when considering that Union is a corporation frequently involved in large international commercial transactions. *Cf. United States v. $359,500 in Currency,* 828 F.2d 930, 935 (2d Cir.1987) (where court expressed its concerns "with the basic fairness of imposing sanctions for the violation of a reporting requirement that might not be known by *the casual traveler* when the government has taken no steps whatsoever to provide reasonable notice of the requirement") (emphasis supplied).

### IV

■ Union's final argument is that if the Act applies to the Taiwanese regulation, then the Act has unconstitutionally incorporated into federal law a regulation adopted without due process safeguards. More specifically, Union contends that incorpo-

---

8. On one level, Union's vagueness challenge essentially amounts to another attempt to argue ambiguity—and while vagueness and ambiguity are related, differences do exist between them. The former generally refers to a word or phrase that is so imprecise so as to be virtually incapable of any readily ascertainable definition, thus bringing to light the problem with wildly discretionary application. The latter term means that two different but fairly easy to recognize definitions are possible; thus, it is more likely that a party should be considered to have had at least some warning as to what might result from its contemplated conduct.

ration of the regulation allows for the kind of unfettered and standardless discretion in the Act's enforcement that the Court held unconstitutional in *Smith v. Goguen*, 415 U.S. 566, 574, 94 S.Ct. 1242, 1248, 39 L.Ed. 2d 605 (1974).

The argument is based on a faulty premise, however, as the Act does not call for the assimilation of foreign law into federal law. Rather, the Act merely provides that once a violation of a foreign law has occurred, that fact will be taken into account by the government official entrusted with enforcement.[9] That is, the government is not applying the foreign law *per se*, but rather it is looking to the foreign law to determine if the Act's provisions are triggered; if so, then it will apply the Act, and not the foreign law. Here, the government officials who seized the salmon did not have unlimited discretion to apply the Act as they saw fit. They merely had to determine whether the exportation of the salmon from Taiwan was accompanied by Taiwanese permit. Thus, *Smith v. Goguen* is inapposite.

## V

The Taiwanese Announcement that restricts the export of salmon from Taiwan constitutes "foreign law" under the Lacey Act. A violation is therefore sufficient to trigger the Act's civil forfeiture provision. The regulation as applied to Union is not unconstitutionally vague, nor does it violate any of Union's due process rights.

AFFIRMED.

---

**9.** The Third, Sixth, Eighth, and Eleventh Circuits have all followed similar reasoning in turning away challenges to the Lacey Act at various stages in its development based on impermissible delegation grounds. *See United States v. Rioseco*, 845 F.2d 299, 302 (11th Cir. 1988); *United States v. Bryant*, 716 F.2d 1091, 1094 (6th Cir.1983), *cert. denied*, 465 U.S. 1009, 104 S.Ct. 1006, 79 L.Ed.2d 238 (1984); *United States v. Molt*, 599 F.2d 1217, 1219 n. 1 (3d Cir.1979); *Rupert v. United States*, 181 F. 87, 90–91 (8th Cir.1910).