**UNITED STATES of America,
Plaintiff,**

v.

**APPROXIMATELY 64,695 POUNDS
OF SHARK FINS, Defendant.**

**No. 03CV0594BTMLSP.**

United States District Court,
S.D. California.

Jan. 20, 2005.

Carol C. Lam, United States Attorney, Mary C. Lundberg, Assistant United States Attorney, U.S. Attorney's Office, San Diego, CA, for Plaintiff.

Bryan Y.Y. Ho, Law Offices of Bryan Y.Y. Ho, Honolulu, HI, J. Peter Olson, Gordon and Rees, LLP, San Diego, CA, Russell Brown, Gordon and Rees, LLP, San Diego, CA, Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION

MOSKOWITZ, District Judge.

This case arises out of the seizure by the United States of approximately 64,695 pounds of shark fins discovered aboard the M/V KING DIAMOND II ("KD II"), a U.S. flag vessel. Claimant Tai Loong Hong Marine Products, Ltd. ("Tai Loong") owned the shark fins. On March 26, 2003, the United States filed a complaint for civil forfeiture of the $775,000 bond serving as a substitute *res* for the shark fins under the Shark Finning Prohibition Act ("SFPA"). On September 13, 2004, the United States filed a motion for summary judgment seeking summary adjudication on the narrow issue of whether the KD II is a "fishing vessel" under the SFPA. Tai Loong opposes the motion.

### I. BACKGROUND

The KD II is a United States flag vessel owned and operated by Tran and Yu, Inc. From 1995 to 2000, the KD II, under prior ownership, was documented with a fishing endorsement and held a Federal Limited Access Permit that authorized the use of longline fishing gear. Tran and Yu, Inc. purchased the KD II in January 2001. From February 26, 2001 through May 9, 2001, under Tran and Yu's ownership, the KD II held a "fishery" endorsement with no expressed entitlement. *See* 46 U.S.C. § 12108 (fishery endorsements); 46 U.S.C. § 12101(a)(1) (defining fisheries). From May 9, 2001 through September 30, 2004, the KD II was documented with a "registry" endorsement. *See* 46 U.S.C. § 12105 (registry endorsements); 46 U.S.C. § 12101(b)(1).

Tai Loong is a Hong Kong based company that regularly deals in seafood products including shark fins. Tai Loong chartered

the KD II to purchase shark fins and shark carcasses from foreign fishing vessels at prearranged meeting points at sea and transport them to Guatemala. Tai Loong verbally contracted with Tran and Yu to charter the KD II and did not execute a written charter contract.[1] (*See* Edward Yu's Decl. ¶ 11.) Tai Loong agreed to pay $1.00 per kilogram of cargo delivered, in addition to reimbursing the expenses for fuel and groceries consumed during the voyage. (*Id.*)

On or about June 18, 2002, the KD II left Honolulu, Hawaii to rendezvous with the foreign fishing vessels at sea. Tai Loong intended that the KD II meet up with approximately 26 different foreign fishing vessels on the high seas. ( *See* Supp. Decl. of Special Agent Zetwo at 3.) Moon Ik Jang, a Tai Loong employee, carried $300,000 in cash on the KD II to purchase the shark fins and carcasses from the foreign vessels. Between June 18, 2002 and August 14, 2002, the KD II purchased and loaded approximately 64,695 pounds of shark fins from 23 to 26 different fishing vessels.[2] (*See* Pl.'s Mem. in Support of Summ J. at 7–8.) Tai Loong contends that during the first three weeks of the voyage, the KD II also loaded 20–30 tons of frozen shark carcasses and had instructions to load more. (*See* Mem. in Opp'n to Pl.'s Mot. for Summ. J. at 7; Edward Yu's Decl. ¶ 19.)[3] However, Tai Loong claims that the KD II's freezer system broke down and the shark carcasses were thrown overboard because they would rot once they thawed. (*Id.*) The United States asserts that there is no documentary evidence of any purchase(s) of shark carcasses. (*See* Supp. Decl. of Special Agent Zetwo.) The government also alleges that repeated interviews of the KD II crew reveal that while the KD II may have intended to purchase shark carcasses, they never got the chance to do so because the United States Coast Guard intervened before any purchases were made. (*Id.*) In deciding the instant motion, however, it is not necessary for the Court to resolve the disputed factual issue of whether Tai Loong did in fact purchase and load shark carcasses aboard the KD II.

On August 14, 2002, the United States Coast Guard boarded the KD II approximately 250 miles off the coast of Guatemala. The Coast Guard discovered that the KD II's hold and working deck were

---

1. The government suggests that the charter agreement between Tai Loong and Tran and Yu was not an arms length transaction between two separate and distinct companies. (*See* Pl.'s Mem. in Support of Summ J. at 6, n. 2.) Russell Yu is the president of Tran and Yu. Eric Yu, a principal of Tran and Yu, is Edward Yu's brother, the managing director of Tai Loong. The government submits that the two brothers, Eric and Edward Yu negotiated the charter deal between Tran and Yu and Tai Loong. The Court accepts, for the purposes of this motion, that the charter agreement was *bona fide.*

2. Moon Ik Jang stated he that he was supposed to meet and buy shark fins from 26 fishing vessels. (*See* Decl. of Special Agent Zetwo at 4.) However, because the U.S. Coast Guard detained the KD II, Mr. Jang stated that he only purchased shark fins from 22

Korean fishing vessels and one Japanese vessel. (*Id.*) However, the records discovered onboard the KD II indicate that the KD II made 26 total shark fin purchases. (*See* Pl.'s Mem. in Support of Summ J. at 7–8.)

3. In his declaration, Edward Yu relies on information given to him by Moon Ik Jang in declaring that the KD II purchased and loaded 20–30 tons of frozen shark carcasses but had to dump them all due to a malfunctioning freezer system. (*See* Edward Yu's Decl. ¶ 19.) However, Special Agent Zetwo, after two interviews with Moon Jang, states that Moon Jang never indicated the KD II purchased any shark meat. (*See* Supp. Decl. of Special Agent Zetwo ¶ 4, Ex. 2.) Furthermore, although the KD II kept detailed records of its shark fin purchases, there was no record of any shark meat purchase. (*Id.* ¶ 5.)

filled with shark fins; however, no shark carcasses were found on board. The KD II was then ordered to divert to San Diego, California. On August 23, 2004, the National Oceanic Atmospheric Administration ("NOAA") seized the 64,695 pounds of shark fins on board the KD II pending its investigation of whether Tai Loong and the KD II violated the SFPA. The shark fins were placed into cold storage in San Diego, California under the control of the United States.

In a separate action regarding the sale of the shark fins, this Court enjoined the government from conducting a public sale of the seized shark fins and allowed Tai Loong to post a bond to recover them.[4] Tai Loong posted a $775,000 bond as a substitute *res* and gained possession of the shark fins. Tai Loong subsequently sold the 64,965 pounds of shark fins to three separate buyers for a total of $619,958.

## II. STATUTORY BACKGROUND

In 1976, Congress enacted the Magnuson–Stevens Fishery Conservation and Management Act ("Magnuson Act") in order to manage and preserve the nation's fishery resources. *See* 16 U.S.C. § 1801 *et seq; Wards Cove Packing Corp. v. National Marine Fisheries Service*, 307 F.3d 1214, 1216 (9th Cir.2002). The Magnuson Act manages the Exclusive Economic Zone ("EEZ") in the waters off the coast of the United States, extending from the seaward boundary of each of the coastal States to 200 nautical miles offshore. *See* 16 U.S.C. §§ 1811, 1802(11); *Washington v. Daley*, 173 F.3d 1158, 1161–62 (9th Cir.1999); *United States v. F/V Alice Amanda*, 987 F.2d 1078, 1079 (4th Cir.1993). Within the EEZ, all fishing is subject to the exclusive fishery management authority of the United States. 16 U.S.C. § 1811(a). *See Ten Taxpayer Citizens Group v. Cape Wind*

*Associates, LLC*, 373 F.3d 183, 189 (1st Cir.2004); *F/V Alice Amanda*, 987 F.2d at 1079. *See also* 16 U.S.C. § 1801(c)(1). The Magnuson Act is administered by the Department of Commerce, the National Marine Fisheries Service ("NMFS"), and the NOAA. *See* 16 U.S.C. § 1802(20). The Magnuson Act vests the Secretary of Commerce (acting through the NMFS) with the authority to issue fishery management regulations. *See Midwater Trawlers Cooperative v. Department of Commerce*, 282 F.3d 710, 715 (9th Cir.2002) (citing 16 U.S.C. §§ 1853, 1855; *Daley*, 173 F.3d at 1162 (9th Cir.1999)).

In 2000, the Shark Finning Prohibition Act ("SFPA") amended the Magnuson Act to "eliminate the wasteful and unsportsmanlike practice of shark finning." Pub.L. 106–557, 114 Stat. 2772 (2000); *see also* 16 U.S.C. § 1822. The "purpose" of the SFPA is to "eliminate shark-finning by addressing the problem comprehensively at both the national and international levels." H.R. 5461, 106th Cong. § 2, 114 Stat. 2772 (2000).

"Shark finning means taking a shark, removing a fin or fins (whether or not including the tail), and returning the remainder of the shark to sea." 50 C.F.R. 600.1202(a). The SFPA, as codified at 16 U.S.C. § 1857(1)(P), and its corresponding regulations make it unlawful for any person to:

(i) to remove any of the fins of a shark (including the tail) and discard the carcass of the shark at sea;

(ii) to have custody, control, or possession of any such fin aboard a *fishing vessel* without the corresponding carcass; or

(iii) to land any such fin without the corresponding carcass.

---

4. See Order Granting Preliminary Injunction, dated March 20, 2003, *Tai Loong Marine*

*Products Limited v. United States of America* (SD Cal. No. 03CV396).

For purposes of subparagraph (P) there is a rebuttable presumption that any shark fins landed from a fishing vessel or found on board a fishing vessel were taken, held, or landed in violation of subparagraph (P) if the total weight of shark fins landed or found on board exceeds 5 percent of the total weight of shark carcasses landed or found on board.

16 U.S.C. § 1857(1)(P) (emphasis added). *Accord* 50 C.F.R. § 600.1203(a)(1)-(3), (b)(2) (prohibiting the same conduct by regulation).

### III. LEGAL STANDARD

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Freeman v. Arpaio,* 125 F.3d 732, 735 (9th Cir.1997). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party

failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *See id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987)

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. *See Celotex,* 477 U.S. at 333, 106 S.Ct. 2548. When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court must not weigh the evidence or make credibility determinations in evaluating a motion for summary judgment. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505.

### IV. DISCUSSION

The United States argues that the KD II is a "fishing vessel" as a matter of law and therefore Tai Loong and the KD II violated the SFPA because they possessed a prohibited amount of shark fins without the corresponding carcasses.[5] Tai Loong, in turn, argues that the KD II is not a "fishing vessel" and therefore the SFPA does not apply to the shark fins on the KD II. Alternatively, Tai Loong contends that the SFPA is unconstitutionally vague on its face and as applied in this case such that it violates Tai Loong's due process rights.

---

**5.** The government invokes the "rebuttable presumption" that the 64,695 pounds of shark fins found onboard the KD II violates the SFPA because the "total weight of shark fins landed or found on board exceeds 5 percent of the total weight of shark carcasses landed or found on board." 16 U.S.C. § 1857(1)(P); 50 C.F.R. § 600.1203(b)(1).

### A. WHETHER THE KD II IS A "FISHING VESSEL" UNDER THE SFPA

■ The government contends that the KD II is a fishing vessel under the SFPA because it falls squarely under the SFPA's broad definition of a fishing vessel on its face and as interpreted by the regulations. Furthermore, the government argues that Congress intended a broad definition of what constitutes a fishing vessel in order to effectuate its concerted effort to ban shark finning in U.S. waters and by U.S. flag vessels. Tai Loong maintains that the KD II is not a "fishing vessel" under the plain language of the statute, the regulations, or the legislative history.

### 1. 16 U.S.C. § 1802(17): DEFINITION OF A "FISHING VESSEL"

■ In interpreting the meaning of a statute, a court must first look to the language of the statute itself. *See United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ("The task of resolving the dispute over the meaning of [a statute] ... begins where all such inquiries must begin: with the language of the statute itself."). Moreover, when "the terms of a statute [are] unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances." *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981); *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

A "fishing vessel" is defined in 16 U.S.C. § 1802(17) as:

> any vessel, boat, ship, or other craft which is used for, equipped to be used for, or of a type which is normally used for-
> (A) fishing; or
> (B) aiding or assisting one or more vessels at sea in the performance of any activity relating to fishing, including, but not limited to, preparation, supply, storage, refrigeration, transportation, or processing.

### a. 16 U.S.C. § 1802(17)(A)

In arguing that the KD II is a fishing vessel under 16 U.S.C. § 1802(17)(A), the government relies on the fact that the KD II was previously documented with a fishing endorsement and held a Federal Limited Access Permit that authorized the use of longline fishing gear. However, as Tai Loong points out, this documentation relates to prior ownership of the KD II from 1995 to 2000. The present owners, Tran and Yu, Inc., did not purchase the KD II until January 2001. However, the Court notes that from February 26, 2001 through May 9, 2001, under Tran and Yu's ownership, the KD II held a "fishery" endorsement with no expressed entitlements.[6] From May 9, 2001 through September 30, 2004, the KD II was documented with only a "registry" endorsement.[7] Thus, while the KD II did have fishing endorsements in its past (even for a short period under Tran and Yu's ownership), at the time when the 64,695 pounds of shark fins were loaded, the KD II held only a registry endorsement.

Whether the KD II is in fact a fishing vessel under 16 U.S.C. § 1802(17)(A) depends on its configuration and how it was outfitted at the time of the seizure. Both parties admit that the record is devoid of

---

**6.** *See* 46 U.S.C. § 12108 (fishery endorsements); 46 U.S.C. § 12101(a)(1) (" '[F]isheries' includes processing, storing, transporting (except in foreign commerce), planting, cultivating, catching, taking, or harvesting fish ... in the navigable waters of the United States or in the exclusive economic zone.").

**7.** *See* 46 U.S.C. § 12105(b) ("A vessel for which a registry endorsement is issued may be employed in foreign trade or trade with Guam, American Samoa, Wake, Midway, or Kingman Reef."); 46 U.S.C. § 12101(b)(1).

evidence relating to the KD II's configuration. As such, genuine issues of material fact remain as to whether the KD II "is used for, equipped to be used for, or of a type which is normally used for ... fishing." 16 U.S.C. § 1802(17)(A). Therefore, summary adjudication is not appropriate on this ground. *See* FED. R. CIV. P. 56(c); *Adickes*, 398 U.S. at 159–60, 90 S.Ct. 1598. Accordingly, the Court cannot hold, as a matter of law, that the KD II is a fishing vessel under 16 U.S.C. § 1802(17)(A).

### b. *16 U.S.C. § 1802(17)(B)*

■ Simply put, the issue in this case narrows down to whether the KD II is a vessel which was used for, equipped to be used for, or of a type which is normally used for aiding or assisting one or more vessels at sea in the performance of *any activity* relating to fishing. *See* 16 U.S.C. § 1802(17)(B). The government contends that the KD II is a "fishing vessel" under § 1802(17)(B) as a matter of law because it aided or assisted the foreign fishing vessels at sea. The Court agrees.

Under the plain language of 16 U.S.C. § 1802(17)(B), the KD II became a fishing vessel because it was used for "aiding or assisting one or more vessels at sea in the performance of any activity relating to fishing, including, but not limited to, preparation, supply, storage, refrigeration, transportation, or processing." 16 U.S.C. § 1802(17)(B). Tai Loong chartered the KD II to rendezvous with multiple foreign fishing vessels at prearranged meeting points on the high seas and purchase shark fins. That is exactly what the KD II did up until the point the U.S. Coast Guard intercepted and diverted the KD II to San Diego. The KD II went from ship to ship on the high seas and purchased shark fins from 23 to 26 foreign fishing vessels. As directed, the KD II then took the shark fins onboard, stored them, and started to transport the fins to Guatemala for resale. These acts directly aided and assisted the foreign vessels in an expressly enumerated fishing activity under the statute. *See* 16 U.S.C. § 1802(17)(B) ("[A]ny activity relating to fishing, including, but not limited to, preparation, supply, *storage*, refrigeration, *transportation*, or processing.") (emphasis added); *Germain*, 503 U.S. at 253–54, 112 S.Ct. 1146 ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.") (citations omitted).

The government further argues that the KD II's purchase(s) of shark fins is an activity related to fishing such that the KD II is a fishing vessel under the SFPA. However, some distinction here is necessary. Importantly, the Court does not equate the mere end-product consumer purchase of shark fins as an activity related to fishing under the SFPA. Such a holding could potentially turn any vessel into a "fishing vessel" simply because it purchased a single shark fin at sea for personal use. The SFPA does not provide for such an all-encompassing reach that covers even ultimate consumers.[8]

In this case, however, Tai Loong and the KD II were not mere end-product consumers. The KD II did not purchase 64,695 pounds of shark fins for personal use or consumption. In reality, the KD II acted as a middleman—moving the shark fins along the distribution chain from fishing vessel to wholesale market.[9] Indeed, the

---

8. In 16 U.S.C. § 1857(1)(P)(ii) Congress employed language that made it unlawful for any person to possess a prohibited amount of shark fins aboard a "fishing vessel." Congress did not extend it to "any vessel" when it

easily could have. *See* 16 U.S.C. § 1857(1)(P)(ii).

9. At oral argument, Tai Loong confirmed that it undisputedly acts as a middleman purchasing shark fins at sea, transporting and landing

KD II effectively brought the shark fin market to the foreign fishing vessels at sea. This act, in and of itself, aided and assisted the foreign fishing vessels which no longer had to store, transport, and land their shark fins in order to sell them in the market. Moreover, the KD II, by prearranging the purchases and meeting points on the high seas, saved the different foreign vessels considerable time and expense in the performance of multiple activities related to fishing. *See* 16 U.S.C. § 1802(17)(B). These fishing vessels were able to offload their catch and remain at sea to continue fishing. This enabled them to increase their overall catch for the particular voyage as compared to vessels that had to return to port to offload their catch.

Tai Loong and the KD II's own documentation corroborates the fact that the KD II aided and assisted fishing. In a document addressed to Moon Ik Jang (the Tai Loong employee aboard the KD II), Eric Yu (a Tran and Yu employee) states that: "I spoke with M/T Kosiam Capt. Kim. He willing to pick up sharkfins for us, *so it will save our time and cost,* please let me know idea." (Supp. Decl. of Special Agent Zetwo at ¶ 2, Ex.1) (emphasis added). The KD II's records indicate that on July 20, 2002 the KD II purchased 18,308 kilograms of shark fins from the M/T KOSIAM. (*See* Pl.'s Mem. in Support of Summ J. at 8.) This single shark fin purchase was larger than the remaining separate purchases combined.[10] No doubt, as the document initially suggested, the M/T KOSIAM saved the KD II time and expense by going ship to ship purchasing shark fins to resell in bulk to the KD II. Similarly, the KD II saved the other foreign fishing vessels time and expense by

going ship to ship purchasing shark fins for resale at port.

Commonsense suggests that buying fish from fishermen at sea for resale is an activity related to fishing under the SFPA. *See* 16 U.S.C. § 1802(17)(B) (statute covers the "performance of *any activity* relating to fishing") (emphasis added). To be profitable, commercial fisherman must sell fish at a price greater than the sum total of their expenses. As the government points out, the ability to sell fish for profit is the reason to engage in commercial fishing as opposed to subsistence or sport fishing. Indeed, bringing the fish to market to effectuate a sale is a fundamental and necessary part of commercial fishing. Selling the fish *at sea* saves the storage, transportation and landing expenses necessary to bring the fish to market, thereby increasing the profitability of the voyage. By going from ship to ship purchasing a total of 64,695 pounds of shark fins for resale in the wholesale market, the KD II aided and assisted an activity related to fishing within the plain meaning of the statute and became a "fishing vessel" as that term is defined in 16 U.S.C. § 1802(17)(B).

## 2. THE CORRESPONDING REGULATIONS AND LEGISLATIVE HISTORY

As a threshold issue, the Court notes that "[i]f the language of a statute is clear and there is no ambiguity, then there is no need to interpret the language by resorting to the legislative history or other extrinsic aids." *Church of Scientology v. Dep't of Justice,* 612 F.2d 417, 421 (9th Cir.1979). *See also California v. Montrose Chemical Corp.,* 104 F.3d 1507, 1514–15 (9th Cir.1997) (party claiming that statutory language is ambiguous bears the bur-

---

them at port, and then reselling the shark fins in the wholesale market.

10. (*See* Pl.'s Mem. in Support of Summ J. at 7–8.) The KD II's next largest shark fin purchase was 2,960 kilograms on July 28, 2002. (*Id.* at 8)

den to show it). Moreover, "[i]f a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

Here, 16 U.S.C. § 1802(17)'s definition of a "fishing vessel" is broad on its face. However, even if the Court assumes, *arguendo,* that 16 U.S.C. § 1802(17) is ambiguous, both the SFPA's authorized regulations and the underlying legislative history make clear that the KD II is within the definition of a fishing vessel.

**a.** REGULATORY INTERPRETATION OF THE "FISHING VESSEL" DEFINITION

The preamble to the regulations implementing the SFPA provides that:

> The prohibition of landing shark fins without corresponding carcasses extends to any vessel (including a cargo or shipping vessel) that obtained those fins from another vessel at sea. *Any such at-sea transfer of shark fins effectively would make the receiving vessel a "fishing vessel," as the receiving vessel is acting "in support of fishing."* Thus, the receiving vessel is prohibited from landing shark fins without corresponding carcasses under this final rule.

67 FR 6194, 6195 (emphasis added). The government argues that this preamble clarifies the definition of a "fishing vessel" to include the KD II.

▮▮ It is well settled that an interpretation of a statute by the agency empowered to administer it is entitled to great weight. *See Aluminum Co. of America v. Central Lincoln Peoples' Utility Dist.,* 467 U.S. 380, 389, 104 S.Ct. 2472, 81 L.Ed.2d 301 (1984); *Blum v. Bacon,* 457 U.S. 132, 141, 102 S.Ct. 2355, 72 L.Ed.2d 728 (1982) ("We have often noted that the interpreta-

tion of an agency charged with the administration of a statute is entitled to substantial deference."); *Lyng v. Payne,* 476 U.S. 926, 939, 106 S.Ct. 2333, 90 L.Ed.2d 921 (1986) ("[A]n agency's construction of its own regulations is entitled to substantial deference.") (citations omitted). In order to uphold an agency's interpretation, courts need not find that the agency's construction is the only reasonable one, or even that it is the result a court would have reached had the question arisen in the first instance in judicial proceedings. *American Paper Institute, Inc. v. American Electric Power Service Corp.,* 461 U.S. 402, 422, 103 S.Ct. 1921, 76 L.Ed.2d 22 (1983) (quoting *Unemployment Compensation Comm'n v. Aragon,* 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946)). Rather, courts "need only conclude that it is a reasonable interpretation of the relevant provisions." *Id.* at 423, 103 S.Ct. 1921. *See also Aluminum Co. of America,* 467 U.S. at 389, 104 S.Ct. 2472.

Here, the preamble to the regulations, promulgated by the NMFS, clearly construes the definition of a fishing vessel to include the activities of the KD II. *See* 67 FR at 6195 ("Any such at-sea transfer of shark fins effectively would make the receiving vessel a 'fishing vessel,' as the receiving vessel is acting 'in support of fishing.' "). Under the deferential standard, the Court finds that this interpretation is reasonable. *See Aluminum Co. of America,* 467 U.S. at 390, 104 S.Ct. 2472 ("[The agency's] interpretation represents a contemporaneous construction of a statute by the [people] charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.") (internal quotation marks omitted); *American Paper Institute,* 461 U.S. at 422, 103 S.Ct. 1921.

Tai Loong, however, argues that the preamble, by its own terms, is limited solely to the prohibition of landing shark fins without the corresponding carcasses. 67 FR at 6195 ("The prohibition of *landing* shark fins without corresponding carcasses extends to any vessel ....") (emphasis added). Moreover, Tai Loong purports to argue that the preamble's fishing vessel definition—covering any at-sea "receiving vessel"—only applies to landing violations and not possession violations. The government only claims the KD II violated the SFPA's possession prohibition under 16 U.S.C. § 1857(1)(P)(ii). *See also* 50 C.F.R. §§ 600.1204(b), 600.1203(a)(2). The government does not allege that the KD II violated the landing prohibition under 16 U.S.C. § 1857(1)(P)(iii).[11] *See also* 50 C.F.R. §§ 600.1204(c), 600.1203(a)(3). Thus, Tai Loong contends the regulatory interpretation of the fishing vessel definition does not apply to the KD II in this case.

Tai Loong's argument misses the point. The preamble's exact language interpreting the fishing vessel definition has a broader reach than just landing violations. *See Chevron,* 467 U.S. at 843, 104 S.Ct. 2778 ("If the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."). The preamble's first sentence, which Tai Loong points to, concerns landing shark fins and extends the landing prohibition to "any vessel (including a cargo or shipping vessel) that obtained those fins from another vessel at sea." 67 FR at 6195. The regulation's prohibition against landing shark fins, 50 C.F.R. § 600.1204(c), adopts this exact language in parenthetical form. *See* 50 C.F.R. § 600.1204(c) ("No person aboard a U.S. or foreign fishing vessel (including any cargo vessel that received shark fins from a fishing vessel at sea) shall land shark fins ....") (parenthetical in original).

However, the preamble's second sentence—which interprets the "fishing vessel" definition to include any vessel receiving shark fins at sea—is not expressly limited to landing prohibitions. Indeed, the second sentence employs broad language providing that "*[a]ny* such at-sea transfer of shark fins effectively would make the receiving vessel a 'fishing vessel,' as the receiving vessel is acting 'in support of fishing.'" 67 FR at 6195 (emphasis added). The word "any" suggests a broader reach than just landing violations. Furthermore, the "receiving vessel" constitutes a fishing vessel because it acted in "support of fishing," 67 FR at 6195, thereby "aiding or assisting ... any activity related to fishing" under 16 U.S.C. § 1802(17)(B). This language is not limited to landing violations. Rather, it interprets the overall fishing vessel definition which applies across the board—to landing and possession violations alike. *See Fidelity Federal Sav. and Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 158, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982) (finding that any ambiguity in the regulation's language was dispelled by the preamble accompanying and explaining the regulation). Accordingly, the preamble to the regulation makes clear that the KD II was acting as a fishing vessel under the SFPA.

**b. *LEGISLATIVE INTENT***

Congress enacted the SFPA to "eliminate the wasteful and unsportsmanlike practice of shark finning." H.R. 5461, 106th Cong., 114 Stat. 2772 (2000). Con-

---

**11.** The government states that its "Complaint establishes that the government's sole alleged basis for forfeiture is Claimant's possession of the shark fins." ( *See* Pl.'s Reply to Claimant's Opp'n at 1, n. 2.)

gress expressly provided that the "purpose of this Act is to eliminate shark-finning by addressing the problem comprehensively at *both the national and international levels.*" *Id.* § 2 (emphasis added). Thus, Congress intended that the SFPA have a broad reach. *See Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778 ("If the Intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.") (footnote omitted).

Indeed, the legislative history reveals that Congress envisioned the SFPA removing U.S. vessels from the shark-finning business altogether. In the Senate Report, Senator Hollings feared that the SFPA would restrict U.S. vessels so broadly, that it could potentially "shift shark finning and the resulting profits over to foreign nations and international corporations ...." 146 CONG. REC. S11744–01 (2000) (statement of Sen. Hollings). Moreover, Senator Hollings stated that "the anticipated result of the new U.S. prohibitions would be that *foreign vessels* will develop new shipment routes through ports outside Hawaii." *Id.* (emphasis added). Thus, the Senator envisioned the SFPA as taking the U.S. out of the shark finning trade notwithstanding the negative economic repercussions.

The Report to the original House of Representatives version of the enacted SFPA (H.R.3535) echoes the same notion. There, the Congressional Budget Office noted that "H.R. 3535 also would impose a new mandate on the private sector by effectively prohibiting the transshipment of fins—*the transfer of fins from foreign vessels outside the U.S. Exclusive Economic Zone to U.S.-based vessels for export from the United States ....*" H.R. REP. NO. 106–650, at 5 (2000) (emphasis added). That is exactly what Tai Loong and the KD II did. Thus, the legislative history

confirms that the SFPA applies to the KD II and its possession of 64,695 pounds of shark fins. *See Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981) ("When we find the terms of a statute unambiguous, judicial inquiry is complete, except in rare and exceptional circumstances ... [and] ... [n]o such circumstances are present here, for our reading of the statute is wholly consistent with the history and the purposes of the Securities Act of 1933.") (internal quotation marks and citations omitted).

**B. WHETHER THE SFPA VIOLATES TAI LOONG'S DUE PROCESS RIGHTS**

■ Tai Loong argues that the SFPA is unconstitutionally vague in that it could not readily determine whether the SFPA applied to the KD II. Specifically, Tai Loong attacks the interplay between 16 U.S.C. §§ 1857(1)(P)(ii) (possession violation), 16 U.S.C. § 1802(17) (fishing vessel definition), and the SFPA's implementing regulations.

■ "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Moreover, a statute is unconstitutionally vague if it fails to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Id. See also United States v. 594,464 Pounds of Salmon,* 871 F.2d 824, 829 (9th Cir.1989) ("A statute's application may violate the constitutional mandate against vagueness if its terms are insufficiently clear ...."). However, this standard should not be mechanically applied. *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982).

*Village of Hoffman* sets forth a continuum for judging vagueness under the Due Process clause. 455 U.S. at 498–99, 102 S.Ct. 1186. If the law "inhibit[s] the exercise of constitutionally protected rights . . . for example . . . the right of free speech or of association, a more stringent vagueness test should apply." *Id.* at 499, 102 S.Ct. 1186. However, statutes with civil rather than criminal penalties warrant "greater tolerance" by the courts because the "consequences of imprecision are qualitatively less severe." *Id.* at 498–99, 102 S.Ct. 1186. *See also 594,464 Pounds of Salmon,* 871 F.2d at 829 (citing *Village of Hoffman,* 455 U.S. at 498–99, 102 S.Ct. 1186).

■ Here, the government seeks civil forfeiture of the 64,695 pounds of shark fins (i.e. the $775,000 bond) under the SFPA. *See* 16 U.S.C. § 1860(a) (authorizing civil forfeiture). A civil forfeiture proceeding is quasi-criminal in character. *One 1958 Plymouth Sedan v. Com. of Pa.,* 380 U.S. 693, 700, 85 S.Ct. 1246, 14 L.Ed.2d 170 (1965); *United States v. One 1985 Mercedes,* 917 F.2d 415, 419 (9th Cir.1990) ("Civil forfeiture actions constitute a hybrid procedure of mixed civil and criminal law elements."). Nevertheless, the civil forfeiture here warrants this Court's "greater tolerance." *Village of Hoffman,* 455 U.S. at 498, 102 S.Ct. 1186. *Accord 594,464 Pounds of Salmon,* 871 F.2d at 829 (citation omitted); *United States v. Search of Music City Marketing, Inc.,* 212 F.3d 920, 925 n. 3 (6th Cir.2000) ("Music City was subject to a seizure and a civil forfeiture proceeding, rather than a criminal prosecution, potentially reducing concerns of unconstitutional vagueness.") (citing *Village of Hoffman,* 455 U.S. at 498–99, 102 S.Ct. 1186). Moreover, the SFPA provisions do not threaten to inhibit constitutionally protected rights like freedom of speech. *Village of Hoffman,* 455 U.S. at 499, 102 S.Ct. 1186. Thus, a "stringent vagueness test" does not apply here. *Id.*

Additionally, Tai Loong is a business and the SFPA's enforcement here acts as a economic regulation. As such, a "less strict vagueness test" applies. *Village of Hoffman,* 455 U.S. at 499, 102 S.Ct. 1186 ("[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow, and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action.") (footnotes omitted). Moreover, Tai Loong, as a "regulated enterprise may have [had] the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process." *Id.* Accordingly, the SFPA provisions do not merit strict scrutiny for vagueness.

Tai Loong concentrates its vagueness attack on the fishing vessel definition arguing that it allegedly requires a tortured, three-tier analysis to comprehend its true scope. However, the fishing vessel definition here is patently broad on its face. *See* 16 U.S.C. § 1802(17). So broad, in fact, that an ordinary person of reasonable intelligence would think that the KD II's activities would probably be included in the blanket fishing vessel definition rather than exempt from it. *See Grayned,* 408 U.S. at 108, 92 S.Ct. 2294. Furthermore, Tai Loong, as a corporation regularly dealing in shark fins, "should at least have been aware of the strong possibility" that the KD II may have constituted a fishing vessel and thus subject to the SFPA. *594,464 Pounds of Salmon,* 871 F.2d at 829 ("[T]he Act is not unconstitutionally vague; Union should at least have been aware of the strong possibility that violation of a foreign regulation would trigger the forfeiture provision of the Act; this is especially true when considering that Union is a corporation frequently involved in large international commercial transactions.")

(footnote and citation omitted).[12]

Neither 16 U.S.C. §§ 1857(1)(P)(ii), 1802(17), nor the corresponding regulations are unconstitutionally vague on their face or as applied to the KD II. Common-sense indicates that picking up fish or its parts at sea aids fishing and thereby renders the vessel within the express definition of a "fishing vessel" under 16 U.S.C. § 1802(17)(B). Additionally, the SFPA's implementing regulations, including the preamble, were published in the Federal Register putting Tai Loong on constructive notice that the NMFS interpreted a "fishing vessel" to include any vessel that picks up fish at sea. *See* 44 U.S.C. § 1507; *Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 92 L.Ed. 10 (1947) ("Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents.") (citations omitted). In sum, a reasonable person in the shark fin business would be aware of the SFPA's application to the KD II's activities. The definition of a "fishing vessel" on its face and as applied to the KD II is not unconstitutionally vague.

### III. CONCLUSION AND ORDER

The Court hereby **GRANTS** in part the government's motion for summary adjudication and holds that, as a matter of law, the KD II is a fishing vessel under the 16 U.S.C. § 1802(17)(B). However, the Court hereby **DENIES** in part the government's summary adjudication motion on whether the KD II is a fishing vessel under 16 U.S.C. § 1802(17)(A). Whether or not for-

feiture results from this determination is a matter not presently before the Court.

**IT IS SO ORDERED.**

---

**12.** *Cf. United States v. $359,500 in Currency,* 828 F.2d 930, 935 (2d Cir.1987) (expressing its concerns "with the basic fairness of imposing sanctions for the violation of a reporting requirement that might not be known by *the casual traveler* when the government has taken no steps whatsoever to provide reasonable notice of the requirement") (emphasis added).